

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-15-2008

# Borden v. Sch Dist E Brunswick

Precedential or Non-Precedential: Precedential

Docket No. 06-3890

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Borden v. Sch Dist E Brunswick" (2008). *2008 Decisions.* Paper 1291.

http://digitalcommons.law.villanova.edu/thirdcircuit_2008/1291

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 06-3890

———

MARCUS A. BORDEN

v.

SCHOOL DISTRICT OF THE
TOWNSHIP OF EAST BRUNSWICK;
BOARD OF EDUCATION OF THE
TOWNSHIP OF EAST BRUNSWICK;
Dr. JO ANN MAGISTRO, in her capacity as
Superintendent, School District of the
Township of East Brunswick,

Appellants

———

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 05-cv-05923)
District Judge:  Honorable Dennis M. Cavanaugh

———

Argued October 3, 2007
Before:  McKEE, BARRY and FISHER, *Circuit Judges*.

(Filed: April 15, 2008)

Alex J. Luchenitser
Ayesha N. Khan
Richard B. Katskee (Argued)
Americans United for the
  Separation of Church & State
518 C Street, N.E.
Washington, DC  20002

Martin R. Pachman
Scarinci & Hollenbeck
2 Paragon Way
Freehold, NJ  07728
        *Attorneys for Appellants*

F. Michael Daily, Jr.
The Rutherford Institute
216 Haddon Avenue
Sentry Office Plaza, Suite 100
Westmont,  NJ  08108

Ronald J. Riccio (Argued)
McElroy, Deutsch, Mulvaney & Carpenter
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, NJ  07962
        *Attorneys for Appellee*

Marc D. Stern
American Jewish Congress
825 Third Avenue, Suite 1800
New York, NY  10022
*Attorney for Amicus-Appellants,*
*American Jewish Congress and The Jewish*
*Social Policy Action Network*

Pammela S. Quinn
O'Melveny & Myers
1625 I Street, N.W.
Washington, DC  20006
*Attorney for Amicus-Appellants, The*
*Interfaith Alliance, The Anti-Defamation*
*League, Hadassah, Jewish Women*
*International, Muslim Advocates,*
*Sikh American Legal Defense and*
*Education Fund, Sikh Council on*
*Religion and Education, and Union*
*Reform Judaism*

Steven G. Gey
Florida State University
College of  Law
425 West Jefferson
Tallahassee, FL  32306
*Attorney for Amicus-Appellant,*
*National Center for Science Education*

Emily B. Goldberg
Gibbons, P.C.
One Gateway Center
Newark,  NJ  07102-5310
     *Attorney for Amicus-Appellants,*
     *American Civil Liberties Union,*
     *American Civil Liberties Union of*
     *New Jersey, American Civil Liberties*
     *Union of Pennsylvania, American Civil*
     *Liberties Union of Delaware,*
     *American-Arab Anti-Discrimination*
     *Committee, American Ethical Union,*
     *American Jewish Committee, Hindu*
     *American Foundation, and The*
     *Unitarian Universalist Association*

---

## OPINION OF THE COURT

---

FISHER, *Circuit Judge*.

Marcus Borden, the head football coach at East Brunswick High School, would like to engage in the silent acts of bowing his head during his team's pre-meal grace and taking a knee with his team during a locker-room prayer.  He brought suit seeking a declaratory judgment that the East Brunswick School District's policy prohibiting faculty participation in student-initiated prayer was unconstitutionally overbroad and vague, and violated his federal and state constitutional rights to

4

freedom of speech, academic freedom, freedom of association, and due process. On cross-motions for summary judgment, the District Court for the District of New Jersey declared the policy unconstitutional on all grounds, and it additionally held that Borden's silent acts would not violate the Establishment Clause of the First Amendment. However, we hold that the policy is not unconstitutional on its face or as applied to Borden. Additionally, we hold that Borden's silent acts violate the Establishment Clause because, when viewing the acts in light of Borden's twenty-three years of prior prayer activities with the East Brunswick High School football team during which he organized, participated in, and even led prayer activities with his team, a reasonable observer would conclude that Borden was endorsing religion when he engaged in these acts. Therefore, and for the reasons set forth in further detail below, we will reverse the District Court's order.

I.

A. Factual History

1. 1983-2005 (Pre-litigation)

Marcus Borden is the head football coach at East Brunswick High School ("EBHS"), and he has held that position since 1983.[1] During his tenure at EBHS, Borden engaged in two pre-game prayer activities that occurred (1) at the team dinner; and (2) while taking a knee in the locker room.

---

[1]Borden is also a tenured teacher of Spanish at EBHS.

As part of the pre-game activities for the EBHS football team, the team ate a pasta dinner together at approximately 3:00 p.m. on game day in the high school cafeteria. In addition to the team, parents and other guests, including the cheerleading squad, were present. Prior to the time Borden coached the team to 1997, a local minister, Reverend Smith, said a pre-meal prayer. However, in 1997, the athletic director told Borden that Reverend Smith could not continue to say the prayer. Instead, Reverend Smith wrote a prayer that the students took turns reading. Then, in 2003, Reverend Smith retired, and Borden did not continue to have the students read Reverend Smith's prayer. Borden instead began a new tradition: he said the prayer prior to the first pre-game dinner of the 2003, 2004, and 2005 seasons. For the subsequent weeks of those seasons, Borden asked those attending the dinner to "please stand," and chose a senior player to say a prayer.

In addition to the prayer before the team dinner, Borden led his team in a prayer immediately before the game. Prior to taking the field, Borden and his assistant coaches asked the players to take a knee in the locker room. The team gathered in front of the chalkboard or dry erase board on one knee, and at that time, Borden discussed the tactics and strategy for that particular game. Following that discussion, Borden led the team in a prayer. Borden described an example of the prayer he said as follows:

> "[D]ear lord, please guide us today in our quest in our game, our championship. Give us the courage and determination that we would need to come out successful. Please let us represent our

6

families and our community well. Lastly, please guide our players and opponents so that they can come out of this game unscathed, [and] no one is hurt."

The team participated in this tradition for twenty-three seasons, beginning when Borden became the coach of the EBHS football team in 1983 and continuing until the 2005 football season.

On September 26, 2005, Jo Ann Magistro, the Superintendent of the East Brunswick School District ("School District"), received a complaint from a parent about the prayer at the team dinner. The parent told Magistro that she thought it was inappropriate that Borden requested that everyone stand for the prayer and that he bowed his head during the prayer. Over the course of that week, two other parents complained to Magistro about the prayer. One of the complaining parents had a son on the team, and the parent told Magistro that her son felt uncomfortable during the prayer and feared that the coach would select him to say the prayer.

Although Magistro did not contact Borden herself, the EBHS principal and athletic director contacted Borden about these complaints. They told him not to lead the team in prayer, and he responded that he did not lead them in prayer. At the team dinner on September 30, 2005, he continued the prayer traditions in the manner described above. It was alleged that he told the students that if they felt uncomfortable during the prayer, they could wait in the restroom until it was over. Following that game, Magistro received several more complaints.

7

On October 6, 2005, the School District's counsel, Martin Pachman, advised Magistro and the East Brunswick Board of Education ("Board") regarding Borden's conduct, stating that a coach for the school could not lead, encourage, or participate in student prayer. Magistro met with Borden the next day, October 7, 2005, and told him that all prayer needed to be student initiated, including the selection of which student would recite the prayer. At that time, Borden asked her if he could continue to say the pre-game prayer in the locker room. In response, Magistro contacted Pachman, who answered Borden's questions. At the end of the conversation, Magistro asked Pachman to provide clear guidelines on faculty participation in student prayer.

Later that day, Magistro sent Borden a memorandum and attached the guidelines provided by Pachman. Magistro stated that she recognized Borden's disappointment, but she expected him to comply with the guidelines, and "[n]ot to comply will be viewed as insubordination." The attached guidelines, which stated that they were not "exhaustive or final," were as follows:

> "1. Students have a constitutional right to engage in prayer on school property, at school events, and even during the course of the school day, provided that:
>
> > A. The activity is truly student initiated; and

8

B. The prayer activity does not interfere with the normal operations of the school district.

This would mean that, for example, if a student or a group of students wish to engage in a prayer before or after their meal in the cafeteria during their lunch period they would have a right to do so, provided that the activity in which they are engaged does not disrupt the normal operation and decorum of the other students eating in the cafeteria. Also, if student athletes on their own decide to hold a prayer huddle before a game, after a game, or during half-time, they have a right to do so.

2. Neither the school district nor any representative of the school district (teacher, coach, administrator, board member, etc.) may constitutionally encourage, lead, initiate, mandate, or otherwise coerce, directly or indirectly, student prayer at any time in any school-sponsored setting, including classes, practices, pep rallies, team meetings, or athletic events.

3. Representatives of the school district, as referenced above, cannot participate in

student-initiated prayer. That very issue was decided by the Fifth Circuit Court of Appeals in a decision cited with approval by the United States Supreme Court and is, therefore, the operative law of the land at this time. To quote the Court, 'If while acting in their official capacities (school district) employees join hands in a prayer circle or otherwise manifest approval and solidarity with student religious exercises, they cross the line between respect for religion and endorsement of religion,' and such conduct was prohibited."[2]

That same evening, Borden resigned, effective immediately, and he did not attend the football game scheduled for that evening. However, on October 17, 2005, Borden withdrew his resignation and agreed to abide by the School District's policy for the remainder of the 2005 season.

The Board held a meeting on October 20, 2005. Michael Baker, the president of the Board, read a prepared statement ("the Board's statement"). In full, it read:

"I want to take this opportunity on behalf of the Board of Education, to make some remarks regarding the events that have transpired with our football coach. First and foremost, Dr. Magistro

[2]A similar memorandum was sent out to the entire staff on October 10.

10

has acted professionally, appropriately and respectfully. She has represented the district and the Board of Education with dignity and class. We sincerely thank her and appreciate the way she has conducted herself. We have instructed Dr. Magistro to get on with running the district and to defer any continuing distractions in this matter to our attorney, Mr. Pachman[,] or to the Board of Education.

Coach Borden, after reconsidering his decision, has rescinded his resignation and continues as coach of the team. He will conduct himself in a manner that is in compliance with the law. We do not believe that there was any deliberate attempt or motive from him to do otherwise. We respect the rights of any employee to disagree with policies, procedures and legal interpretations, but cannot and will not tolerate violations of these rules by any employee of the district. Each of us up here, are elected to serve this community and take an oath of office to respect and defend the Constitution of the United States and there is no ambiguity or gray area for us in understanding this oath. We will, whenever confronted, follow the laws of our land regardless of personal views or interpretations of these laws. Our employees will do the same. It is our uncompromising expectation that Coach Borden's personal agenda along with his lawyer[']s, does not in any way interfere with this school district.

11

The Board of Education will continue to see that our schools run at the highest of standards and with complete respect for the law and for the rights of all of our students and staff. Any comments that come from sources other than the Board of Education, our counsel or the Superintendent are not official and therefore not necessarily representative of our position.

We are a divided nation and have been since the ratification of our Constitution in 1791. Issues of faith are personal and divisive today as they were back then. This meeting and subsequent [Board of Education] meetings are not the forum for such debate, and legal [c]onstitutional rulings are not the purview of the Board of Education. Congress, the President and the Supreme Court[] make, enforce and interpret the laws and these branches of [g]overnment are the appropriate places to lobby for one's position on these matters, not here. This is not a platform for individual agendas on [c]onstitutional cases that have already been clearly decided. I will therefore preside over this meeting this evening with these thoughts in mind.

One of the foundations of our democracy is that the right of someone to express concern or to bring a matter of discomfort to the attention of authority is to be respected and protected. It is not to be vilified and dishonored. Some of the

12

extreme language, hateful emails and inappropriate and inaccurate reporting of this story, has shifted blame onto the blameless and has distorted beyond measure the matter at hand. If we can do one thing together as a community, it should be to stand up in vast numbers and express outrage and concern against those who would cheapen the actions of brave and committed Americans. No person should have to be afraid to express their constitutionally protected individual rights. Hopefully, we can all learn from this experience and move forward with dignity and respect for each other. Thank you."[3]

Following the issuance of the October 7 guidelines and the Board's statement on October 20, Borden conducted himself in accordance with the School District's new policy for the balance of the school year, notwithstanding the litigation he instituted on November 21, 2005.

## 2. 2006-Present

Prior to the 2006 football season, Borden sent an email to Sergio Garcia and Randall Nixon, the co-captains of the team for the 2006 season, requesting that they ask the players whether they would like to continue the tradition of praying at the team

---

[3]Following the media hype created by this case, EBHS student internet message boards were bombarded with posts, several of which included derogatory comments based on religion and race.

dinner and prior to the game. In his email request, he told the co-captains that "[w]hatever the players decide to do is fine with me." He asked the captains to pass on the players' response and to ensure him that they spoke with all of the players on the team. Nixon's response indicated that the players voted to continue both the pre-meal and pre-game prayer. Following the grant of summary judgment in his favor in this case, Borden stood and bowed his head during the prayer before the meal, and remained on one knee during the pre-game prayer.

## B. Procedural History

On November 21, 2005, Borden instituted this litigation against the School District, the Board of Education, and Magistro in her capacity as Superintendent (collectively, "the defendants") in the Superior Court of New Jersey. The defendants removed the suit to the United States District Court for the District of New Jersey on December 22, 2005. Rather than seeking to continue to do what he had done for the previous twenty-three years, Borden sought "to show his respect for his players, respect for The Team Prayers, and respect for East Brunswick's football tradition by engaging in two silent acts during The Team Prayers: (i) bowing his head during grace; and (ii) taking a knee with his team in the locker room." His complaint alleged that the guidelines and the Board's statement prevented him from undertaking either of these activities.

Borden's complaint presented two causes of action. Under Count 1, Borden alleged that the defendants violated his rights as embodied in Articles 1, 4, 6 and 18 of the New Jersey

14

Constitution.[4]  Count 2 alleged that the defendants violated his Due Process and Equal Protection rights under the Fourteenth Amendment of the United States Constitution.  For both of these counts, Borden sought the same relief:  (1) a declaratory judgment stating that the guidelines issued on October 7 and the Board's statement on October 20 were unconstitutional based on the respective constitutional provisions; (2) preliminary and permanent injunctions preventing the defendants from enforcing the guidelines and the Board's statement, or from "taking any action of any kind, by way of complaint or otherwise, against Coach Borden" for his silent acts of bowing his head and taking a knee during the team's prayers; and (3) an order vacating the guidelines and the Board's statement.

The School District filed a motion for summary judgment that primarily focused on whether its policy was proper under First Amendment jurisprudence, arguing that it did not violate the Free Exercise Clause, and its policy was necessary because Borden's prayer activities violated the Establishment Clause. Borden filed a cross-motion for summary judgment, and

_____

[4]In fact, it appears that Borden was not referring to Articles of the New Jersey Constitution, but paragraphs under Article 1.  While Article 1 of the New Jersey Constitution establishes individual rights, Article 4 establishes the powers of the New Jersey Legislature, Article 6 establishes the powers of the judiciary in New Jersey, and Article 18 does not exist.  In contrast, the relevant paragraphs of Article 1 provide the following rights: liberty (para. 1), free exercise of religion (para. 4), freedom of speech (para. 6), and freedom of association (para. 18).  *See* N.J. Const. art 1, ¶¶ 1, 4, 6, 18.

15

expressly stated that he was not asserting a claim under the Free Exercise Clause despite his citation of paragraph 4 of the New Jersey Constitution in his complaint.  Borden argued that "his First and Fourteenth Amendment United States constitutional rights as well as Article 1 ¶¶ 1, 6 of his New Jersey constitutional rights" protect his "symbolic conduct."[5]  Further, Borden argued that the School District's justification for its policy was based on an erroneous interpretation of the Establishment Clause.

_____

[5]Borden did not specifically assert a claim as to his rights under the First Amendment of the United States Constitution. His complaint did, however, state a claim as to his Due Process rights under the Fourteenth Amendment of the United States Constitution.  Thus, Borden arguably asserted a claim under the First Amendment because an individual's free speech rights under the First Amendment apply to the states through the Due Process Clause of the Fourteenth Amendment.  *See Gitlow v. New York*, 268 U.S. 652, 666 (1925).  The defendants have not argued that Borden did not assert a claim under the First Amendment.  Even if they had, however, it would not change our analysis, because Borden stated a claim under the free speech clause of the New Jersey Constitution, which has protections that are "generally interpreted as co-extensive with the First Amendment." *Twp. of Pennsauken v. Schad*, 733 A.2d 1159, 1169 (N.J. 1999) (citing *Hamilton Amusement Ctr. v. Verniero*, 716 A.2d 1137 (N.J. 1998)).  Thus, while we do not reach a conclusion on whether he stated a free speech claim under the First Amendment, we will assume that he did for the purposes of our analysis.

16

On July 25, 2006, the District Court heard oral argument on the summary judgment motions, and following argument, Judge Cavanaugh entered his decision on the record from the bench. He stated:

> "I agree that an Establishment Clause violation would occur if the coach initiated and led the activity, but I find nothing wrong with remaining silent and bowing one's head and taking a knee as a sign of respect for his players' actions and traditions, nor do I believe would a reasonable observer.

> I believe to preclude the Plaintiff from such an action would be a violation of his rights. I believe the Directives as stated are overbroad and vague. To threaten the Plaintiff with insubordination if he is to participate places him in an untenable position.

> I find that the Plaintiff's request to bow his head in silence and take a knee do not violate the Establishment Clause of the Constitution.

> I find, further, that the Defendants' directive regarding the Plaintiff's nonparticipation is over broad and vague, and violates the Plaintiff's First and Fourteenth Amendment rights to free speech, freedom of association, academic freedom, as well as New Jersey's constitutional rights to liberty and free speech.

17

Accordingly, since there are no issues of material fact left in dispute, as a matter of law, I deny the Defendants' motion and grant the Plaintiff's motion for summary judgment."

On July 26, 2006, the District Court entered an order denying the defendants' motion for summary judgment, granting Borden's cross-motion for summary judgment, and awarding Borden costs and counsel fees. The defendants' timely appeal followed.

## II.

The District Court had jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1367(a). We have jurisdiction over final judgments of the District Court under 28 U.S.C. § 1291.[6] We exercise plenary review over a district

_____

[6]Borden argues that we do not have jurisdiction over this appeal because it has become moot. He argues that he only sought relief for the 2006 season, and because his coaching contract is subject to annual renewal, a live controversy, as required by Article III, Section 2 of the United States Constitution, no longer exists. However, this appeal contains the factors necessary to warrant a finding that it is not moot. *See City of Erie v. Pap's A.M.*, 529 U.S. 277, 288 (2000). First, the School District has an ongoing injury. *See id.* at 288; *see also Congregation Kol Ami v. Abington Twp.*, 309 F.3d 120, 132 (3d Cir. 2002). The District Court's decision did not pertain to the 2006 season alone. Instead, the District Court found that the guidelines were overbroad and vague, which invalidates the

18

court's grant of summary judgment, and will uphold the district court's grant of a summary judgment motion on any basis so long as that basis was previously presented to the district court. *Nasir v. Morgan*, 350 F.3d 366, 368 (3d Cir. 2003). Moreover, "[o]ur review over constitutional issues is plenary." *United States v. One Toshiba Color Television*, 213 F.3d 147, 151 (3d Cir. 2000).

III.

The District Court found that the School District's policy prohibiting faculty participation in student-initiated prayer was unconstitutional on its face because it was both overbroad and

guidelines as applied to any faculty member. *See Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003) (stating that where a court determines that a statute or policy is overbroad, that ruling "invalidate[s] *all* enforcement of that law"). Second, Borden continues to have an interest in the present case. *See Pap's A.M.*, 529 U.S. at 288. He is likely to be rehired as the football coach each year because the School District has rehired him each year for twenty-five consecutive years, and more importantly, the School District's guidelines affect him at all times as a tenured teacher at EBHS. Finally, "this is not a run of the mill voluntary cessation case . . . [because] it is the plaintiff who, having prevailed below, now seeks to have the case declared moot." *See id.* As in *Pap's A.M.*, we have an interest in preventing litigants from "manipulat[ing] the Court's jurisdiction to insulate a favorable decision from review." *Id.* Therefore, the case before us is not moot, and we have jurisdiction to review it.

vague.  It also found that the policy was unconstitutional in its application to Borden because it violated Borden's constitutional rights to freedom of speech, academic freedom, freedom of association, and due process.  Finally, it found that Borden's requested silent acts of bowing his head and taking a knee while his team prayed would not violate the Establishment Clause. We address each of these issues in turn.

## A.  Overbreadth and Vagueness

Borden challenged the guidelines and the Board's statement on their face, arguing that they are unconstitutionally overbroad and vague.  The District Court agreed.  For the reasons that follow, the District Court's conclusions are erroneous.

### 1.  Overbreadth

Under the First Amendment overbreadth doctrine, a person may challenge a statute or policy, even though it is not unconstitutional as applied to that particular person, because "[its] very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973).  A court must consider that the overbreadth doctrine is "strong medicine" that should be used "sparingly and only as a last resort."  *Id.* at 613.  As a result, "a single impermissible application" is insufficient to deem a statute or policy invalid, *New York v. Ferber*, 458 U.S. 747, 772 (1982) (internal quotation marks and citation omitted), and instead, "a law should not be invalidated

for overbreadth unless it reaches a substantial number of impermissible applications." *Id.* at 771.

Thus, the proper inquiry is whether a statute or policy "prohibits a substantial amount of protected expression." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002). To determine how broad the statute or policy sweeps, we look to four factors: (1) "the number of valid applications," (2) "the historic or likely frequency of conceivably impermissible applications," (3) "the nature of the activity or conduct sought to be regulated," and (4) "the nature of the state interest underlying the regulation." *Gibson v. Mayor & Council of Wilmington*, 355 F.3d 215, 226 (3d Cir. 2004) (internal quotation marks and citation omitted).

Based upon the *Gibson* factors, we conclude that the School District's guidelines and the Board's statement are not unconstitutionally overbroad. Borden argues that this policy will reach beyond impermissible faculty involvement in prayer and, in addition, will prohibit permissible faculty religious exercise. We will address the two relevant paragraphs of the guidelines and the Board's statement separately.

Paragraph two of the guidelines prohibits a school official from "encourag[ing], lead[ing], initiat[ing], mandat[ing], or otherwise coerc[ing]" students into prayer. For this paragraph, the number of valid applications is immense. The Supreme Court has held that a school district is in violation of the Establishment Clause where "the degree of school involvement makes it clear that the [prayer activities] bear the imprint of the State and thus put school-age children who

21

objected in an untenable position." *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 305 (2000) (internal quotation marks and citation omitted). Thus, if a school "affirmatively sponsors the particular religious practice of prayer," it is in violation of the Establishment Clause. *Id.* at 313. Paragraph two of the guidelines strikes at the heart of this prohibition. Generally, if a school official is engaging in student prayer to the extent that they are leading it, initiating it, or requiring it, the school official, and thus the school district, is violating the Establishment Clause. In fact, Borden does not point to a possible misapplication of this portion of the guidelines. Moreover, the Supreme Court has noted that "compliance with the Establishment Clause is a state interest sufficiently compelling to justify content-based restrictions on speech." *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 761-62 (1995). Therefore, paragraph two of the guidelines is not unconstitutionally overbroad.

Paragraph three of the guidelines prohibits a school official from "participat[ing]" in any student-initiated prayer. This paragraph of the guidelines similarly has numerous valid applications. A school district also violates the Establishment Clause if "a reasonable observer familiar with the history and context of the display would perceive the display as a government endorsement of religion." *Modrovich v. Allegheny County*, 385 F.3d 397, 401 (3d Cir. 2004); *see also County of Allegheny v. Am. Civil Liberties Union Greater Pittsburgh Chapter*, 492 U.S. 573, 596 (1989) (adopting the endorsement test). Not every religious display of a school official will have the necessary "history and context" to be an Establishment Clause violation, but to the extent that this paragraph is

22

overbroad, it is not so substantial as to make the guidelines invalid. Rather, any concern about overbreadth may "be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied." *Broadrick*, 413 U.S. at 615-16. Moreover, the School District is equally as interested in avoiding Establishment Clause violations in this way. Therefore, paragraph three of the guidelines is not unconstitutionally overbroad.

Borden also takes issue with the Board's statement that it "cannot and will not tolerate violations of these rules by any employee of the district," arguing that the statement does not describe what conduct it prohibits. However, the statement began, "[w]e respect the rights of any employee to disagree with policies, procedures and legal interpretations." It is obvious to us that the rules to which the Board is referring are the recently promulgated guidelines that had been distributed to all faculty only ten days before the October 20 meeting. Because the October 20 statement is simply referring to teachers following the School District's guidelines, the same analysis applies to it as to the guidelines themselves. For the same reasons, we find that the Board's statement is not unconstitutionally overbroad.

2. Vagueness

In a void-for-vagueness challenge, we must ensure that a statute or standard is fair in that it is not so vague that a party would not know what conduct is prohibited. *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1136 (3d Cir. 1992). Thus, a statute is unconstitutionally vague when "men of common intelligence must necessarily guess at its meaning." *Broadrick*,

23

413 U.S. at 607 (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)).  The inquiry is completed on a case-by-case basis, and the party opposing the statute or standard must show that it is vague as applied to him.  *San Filippo*, 961 F.2d at 1136.  In completing this analysis, it is important to note that, in the civil context, statutes need not be as precise as in the criminal context and are, therefore, less likely to be invalidated under a void-for-vagueness challenge.  *Id.* at 1135.  Borden claims that the use of the word "participate" renders the guidelines unconstitutionally vague.  Standing alone, the word "participate" may be vague.  However, "participate" cannot be read in isolation, but must be read in the context of the entire paragraph discussing the prohibition on faculty participation with student-initiated prayer.  The paragraph prohibiting faculty participation elaborates on what it considered participation by quoting from the Fifth Circuit's decision in *Doe v. Duncanville Independent School District*, 70 F.3d 402 (5th Cir. 1995).  Thus, the faculty, including Borden, knew that the prohibition on participating in prayer with students included joining hands in prayer or demonstrating some approval of or solidarity with students' prayer.  Such a description is "'sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties . . . consonant alike with ordinary notions of fair play and the settled rules of law.'"  *San Filippo*, 961 F.2d at 1136 (quoting *Connally*, 269 U.S. at 391).

Moreover, we find support that the word "participate" is not vague from the Supreme Court's decision in *Board of Education of Westside Community Schools v. Mergens*, 496 U.S. 226 (1990).  In *Mergens*, a school district refused access to a Christian student group, and the group brought suit arguing that

24

the school district was in violation of the Equal Access Act, 20 U.S.C. §§ 4071 *et seq.*, which prohibits public secondary schools from denying equal access to student groups. 496 U.S. at 232-33. The school district responded that the Act violated the Establishment Clause and thus was unconstitutional. *Id.* at 233. However, the Court held that the Act did not violate the Establishment Clause. *Id.* at 253. In reaching its decision, the Court relied extensively on a provision of the Act that limited the faculty involvement permissible in any student religious groups to a "nonparticipatory capacity." 496 U.S. at 236, 251-53 (citing 20 U.S.C. § 4071(c)(3)). The Act does not define "nonparticipatory capacity," and the Court did not define it either. Nevertheless, the Court found that the provision removed the risk of both "official state endorsement or coercion," *id.* at 251, and excessive entanglement with religion, *id.* at 253, because it removed the possibility that school officials would be "participating" in the students' religious activities. Considering the Court's reliance on the "nonparticipatory" provision of the Act without a definition of what the word "participate" means, it is difficult to conceive how the School District's guidelines could be so vague that people of common intelligence could not "guess at [their] meaning." *Broadrick*, 413 U.S. at 607. Therefore, for all of the above reasons, we find that the guidelines are not unconstitutionally vague.

## B.  As-Applied Constitutional Challenges

In addition to arguing that the policy prohibiting faculty participation in student-initiated prayer was unconstitutional on its face, Borden also challenged the policy as it applied to him,

25

arguing that it violated his constitutional rights to freedom of speech, academic freedom, freedom of association, and due process.  The District Court agreed.  Again, for the reasons that follow, the District Court's conclusion is erroneous.

### 1.  Freedom of Speech

The first issue is whether the School District's guidelines and the Board's statement violated Borden's right to freedom of speech under the New Jersey Constitution and the First Amendment of the United States Constitution.[7]  The First Amendment states that "Congress shall make no law . . . abridging the freedom of speech . . . ."  U.S. Const. amend. I.  This provision applies to the states through the Due Process Clause of the Fourteenth Amendment.  *See Gitlow v. New York*, 268 U.S. 652, 666 (1925).  The Supreme Court has held that the First Amendment prohibits the government from "regulat[ing] speech based on its substantive content or the message it conveys."  *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995).

The question is whether the First Amendment protects Borden, the employee of a public school system, when he bows his head and takes a knee with his team while they pray.  As our case law indicates, "the day has long since passed when individuals surrendered their right to freedom of speech by

[7]We will use federal constitutional principles of free speech rights in our analysis because the free speech clause of the New Jersey Constitution "is generally interpreted as co-extensive with the First Amendment."  *Schad*, 733 A.2d at 1169.

accepting public employment." *Sanguigni v. Pittsburgh Bd. of Pub. Educ.*, 968 F.2d 393, 396 (3d Cir. 1992) (citing *Connick v. Myers*, 461 U.S. 138, 143-44 (1983); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). However, while "public employees enjoy substantial free speech rights," *id.* at 396, those rights are limited. *See Connick*, 461 U.S. at 148-54; *Pickering*, 391 U.S. at 568.

To determine whether the First Amendment protects a public employee's speech, the Supreme Court has established a two-prong test. Under the first prong, the court must determine whether the employee is speaking upon matters of public concern. *Connick*, 461 U.S. at 146. If the employee's speech relates only to his or her personal interest, the First Amendment does not protect the speech because "government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Id.* at 146. However, if the employee's speech is on a matter of public interest, the second prong is triggered and requires the court to engage in the *Pickering* balancing test. *See id.* at 150. The balancing is "between the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568.[8] Because

---

[8]We reject Borden's argument that we should apply the Supreme Court's standard in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), rather than the standard set forth in *Pickering* and *Connick*. In *Tinker*, the Supreme Court specifically identified both students and teachers

we find that Borden's speech was not on a matter of public concern, we do not need to engage in the *Pickering* balancing test.

_____

as those who have First Amendment rights, stating that neither students nor teachers "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Id.* at 506. However, the Court in *Tinker* was dealing with a question of the protections given to a student's speech, not a teacher's speech. *Id.* at 513 (holding that students have free speech rights unless the student's conduct "for any reason . . . materially disrupts classwork or involves substantial disorder or invasion of the rights of others"); *see also Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 270-71 (1988) (noting that *Tinker* involved a question of student speech). More importantly, *Tinker* did not alter the test that the Supreme Court established to evaluate the speech of a public employee in *Pickering*, 391 U.S. at 568, and then *Connick*, 461 U.S. at 146. *Pickering* involved a teacher who wrote a letter to a newspaper expressing concern regarding the management of the school district, and the Court held that the teacher, as a public employee, had a right to freedom of speech. 391 U.S. at 574-75. *Connick* elaborated on the proper test for the speech of a public employee. *See* 461 U.S. at 146-50. Therefore, our application of *Pickering* and *Connick* is appropriate in these circumstances.

i.  Matter of Public Concern[9]

Under the test established in *Pickering* and *Connick*, we must first determine whether Borden's silent acts of expression are on a matter of public concern.  Borden alleges two interests that his silent acts serve:  (1) providing the team with feelings of unity and increasing team morale; and (2) respecting the players' prayers.[10]  For the reasons that follow, we find that

_____

[9]Borden argues that we may not address this issue because the defendants did not argue that the speech was not on a matter of public concern in their initial brief or their reply brief before the District Court.  However, "'[w]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.'"  *Tenafly Eruv Assoc., Inc. v. Borough of Tenafly*, 309 F.3d 144, 158 n.15 (3d Cir. 2002) (quoting *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991)).  Thus, we must engage in a proper constitutional analysis of whether Borden has a free speech right to engage in his proposed silent acts regardless of what legal theory he or the defendants argued at any point in this litigation.  Here, a proper constitutional analysis requires us to consider whether Borden's speech was on a matter of public concern before we make any other determinations.  Therefore, not only are we not prohibited from engaging in step one of the *Connick* test, we must do so.

[10]To the extent that Borden argues that his speech protects student-initiated prayer, his argument is unfounded.  He would like to bow his head during a pre-meal grace and take a

Borden's stated interests are personal to Borden and his team and are not matters of public concern.

*Connick* instructs that "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." 461 U.S. at 147-48.[11] The content of speech on a matter of public concern generally addresses a social or political concern of the community. For example, we have stated that speech is on a matter of public concern if it "relate[s] to broad social or policy issues," including expressing the desirability of assassinating the President or complaining about racial discrimination. *Sanguigni*, 968 F.2d at 397 (citing *Rankin v. McPherson*, 483 U.S. 378, 386-87 (1987); *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410 (1979)). We have also categorized speech "implicat[ing] the discharge of public responsibilities by an important government office, agency, or institution" as speech addressing a matter of public concern. *See id.* at 397-98 (citing cases involving speech that touched on the pressure to work on political campaigns, the allocation of funds to certain school programs, government corruption, and the

---

knee with his team before a game. These silent acts do nothing to protect student-initiated prayer because the students are able to engage in student-initiated prayer regardless of Borden's silent acts. Thus, we find his argument unavailing.

[11]Contrary to Borden's contention, this question is one of law, and thus is properly considered by a reviewing court. *Connick*, 461 U.S. at 148 n.7 ("The inquiry into the protected status of speech is one of law, not fact.").

30

lowering of academic standards and its effects); *see also Holder v. City of Allentown*, 987 F.2d 188, 195 (3d Cir. 1993) (stating that speech is on a matter of public concern where "the speaker seeks to 'bring to light actual or potential wrongdoing or breach of public trust' on the part of government officials" (quoting *Connick*, 461 U.S. at 148)). Finally, the content of speech is on a matter of public concern where it "relate[s] primarily to the way in which a government office [i]s serving the public." *Sanguigni*, 968 F.2d at 398 (citing *Czurlanis v. Albanese*, 721 F.2d 98 (3d Cir. 1983), in which a county employee criticized the state and county governments at a meeting of the county's governing body regarding how he thought those governments were wasting taxpayer's money). In short, the content of these types of speech goes to the core of the First Amendment because it adds to the debate on matters of public importance.

In contrast, the content of an employee's speech is not a matter of public concern where the comments are only with regard to the morale of the office. *See Connick*, 461 U.S. at 148 (holding that the employee's questionnaire regarding office morale was not a matter of public concern because she was merely gathering "ammunition" against her supervisors); *Sanguigni*, 968 F.2d at 399 (holding that an employee's statements regarding morale alone do not rise to the level of a matter of public concern). In *Connick*, the Supreme Court noted that the level of morale in a government office may relate to the efficiency of that office, and the public may be interested in that efficiency. 461 U.S. at 148. However, where the employee's efforts did not focus on relaying that information to the public, it could not be speech on a matter of public concern. *Id.* at 148 & n.8.

31

In the present case, Borden portrays the content of his conduct as secular gestures intended to promote solidarity, help form the team into a cohesive family unit, and show respect for the players' prayers. The content of his message, however, is not a matter of public concern. Borden does not perform these silent acts as part of a broad social or policy statement of being able to take a knee or bow his head in public.[12] Additionally, he is not shedding light on any matter with regard to EBHS's operations that would be important to the public because his silent acts do not touch upon the way in which a government institution is discharging its responsibilities. *See*, *e.g.*, *Pickering*, 391 U.S. at 569-70 (finding that criticisms of a school district's allocations of funds is speech on a matter of public concern). Instead, Borden expressly argues that he wishes to engage in this speech out of concern for his team's morale. However, he is not trying to bring public morale issues within the school's administration, but is merely trying to bolster his team by demonstrating that "this team is a family," which does not amount to a matter of public concern. *See Connick*, teacher's criticism of the school district in a letter to a newspaper).

In the present case, the form and context of Borden's silent acts only reinforce its non-public nature. Borden's speech does not occur in any type of official proceeding, and even more importantly, Borden's speech does not extend into any type of public forum. In fact, Borden himself admits that the bowing of

[12]Borden does not allege that his silent acts are religious speech that is on a matter of public concern, and we do not reach that question.

32

his head and taking of a knee occur in private settings, namely at an invitation-only dinner and in a closed locker room. Again, we find further support for this decision in the Sixth Circuit's opinion in *Dambrot*, where the court noted the private nature of the coach's message to his players because the coach's pep talk was given in a locker room for the private consumption of his players. 55 F.3d at 1188. Thus, we conclude that as in *Dambrot*, the bowing of Borden's head and taking a knee are meant for the consumption of the football team only. Therefore, Borden's expressive conduct of bowing his head and taking a knee are not matters of public concern triggering protection of his right, as a public employee, to freedom of speech.[13]

---

[13]Based on our prior decisions, as well as the decisions of other courts of appeals, Borden's actions do not constitute speech on a matter of public concern regardless of the application of the Supreme Court's most recent case in the line of cases on the free speech rights of public employees. *See Garcetti v. Ceballos*, 126 S. Ct. 1951 (2006). In *Garcetti*, the Court considered whether the First Amendment protects a public employee's speech when the employee speaks pursuant to his or her official duties. *Id.* at 1960. It held that the analysis established by *Pickering* and its progeny applies only when an employee speaks as a citizen. *Id.* Thus, the First Amendment simply does not protect speech made pursuant to the employee's official duties. *Id.* After reaching its conclusion, the Court expressly stated that it left the determination of whether this analysis would apply in the educational context for another day. *See id.* at 1962 ("We need not, and for that reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or

33

ii. *Pickering* Balancing Test

We find it unnecessary to engage in the *Pickering* balancing test in the present case because Borden does not have a free speech right that would trigger the analysis. In order to utilize the balancing test, the public employee must have a free speech right to weigh against the government's interest in prohibiting the speech. However, Borden's silent acts of bowing his head and taking a knee are not on matters of public concern so he does not have a free speech right to trigger the balancing test. For the above reasons, we conclude that the guidelines and the Board's statements did not violate Borden's free speech rights under the First Amendment of the United States Constitution and under the New Jersey Constitution.

2. Academic Freedom

Borden argues that the right to academic freedom affords him the right to exercise professional judgment in teaching his players respect for others, or as he calls it, "Character Education." In making this argument, Borden specifically points out that he is both a football coach and a tenured teacher at EBHS, and states that "[he] believes in teaching [the players] how to be persons of good character and principle."

---

teaching."). If *Garcetti* applied to this case, Borden's speech would not be protected as it was made pursuant to his official duties as a coach of the EBHS football team and not as an ordinary citizen. However, even if *Garcetti* does not apply in the educational context, Borden's conduct is not on a matter of public concern for the reasons just described.

34

We have held that a teacher's in-class conduct is not protected speech. *Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1176 (3d Cir. 1990) ("Although a teacher's out-of-class conduct, including her advocacy of particular teaching methods, is protected, her in-class conduct is not." (internal quotation marks and citations omitted)). The rationale for this holding is that the teacher is acting as the educational institution's proxy during his or her in-class conduct, and the educational institution, not the individual teacher, has the final determination in how to teach the students. *See Brown v. Armenti*, 247 F.3d 69, 74-75 (3d Cir. 2001).

In order to determine if the teacher's conduct is considered in-class conduct, we must determine whether the teacher is engaging in one of the "four essential freedoms" that constitute academic freedom. *Id.* at 75. The "'four essential freedoms'" include the right of an educational institution "to choose 'who may teach, what may be taught, how it shall be taught, and who may be admitted to study.'" *Edwards v. Cal. Univ. of Pa.*, 156 F.3d 488, 492 (3d Cir. 1998) (quoting *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 312 (1978)). Based on this analysis, we have previously determined that a teacher's in-class conduct includes choosing one's own teaching methods, *id.* at 491-92, utilizing one's own "classroom management technique," *Bradley*, 910 F.2d at 1176, and assigning grades to a student, *Brown*, 247 F.3d at 75.

In the case before us, Borden concedes that the silent acts of bowing his head and taking a knee are tools that he uses to teach his players respect and good moral character. Thus, by his own admission, his coaching methods are pedagogic. As a

35

result, he is acting as a proxy for the School District, and the School District may choose both how its students are taught and what its students are taught. Here, the School District adopted Pachman's guidelines because it determined that Borden's pedagogic methods were inappropriate. As evidenced by this continued litigation, the School District continues to find Borden's pedagogic methods of teaching his players respect by engaging in his silent acts inappropriate. While Borden certainly has the right to voice his disagreement with the School District's policy, in accord with our past precedent, he does not have a right to act in contravention of the School District's policy based upon a right to academic freedom.[14] For the above reasons, the District Court erred in holding that the guidelines and the Board's statement violated Borden's right to academic freedom.

---

[14]Borden alleges that a decision that he does not have the academic freedom to engage in these acts amounts to controlling his mind. However, our precedent has consistently demonstrated that it is the educational institution that has a right to academic freedom, not the individual teacher. *See*, *e.g.*, *Brown v. Armenti*, 247 F.3d 69, 75 (3d Cir. 2001). The teacher, in turn, has the right to speak on matters of public concern, including advocating certain pedagogic methods. *See Edwards v. Cal. Univ. of Pa.*, 156 F.3d 488, 491 (3d Cir. 1998) ("[A]lthough [a teacher] has a right to advocate outside of the classroom for the use of certain curriculum materials, he does not have a right to use those materials in the classroom."). However, the teacher cannot act in contravention of his or her educational institution's in-class policies in the name of academic freedom.

36

### 3. Freedom of Association

Borden's complaint also alleged, and the District Court held, that the School District's guidelines and the Board's statement violated Borden's right to freedom of association. Specifically, he asserts that First Amendment jurisprudence demonstrates that the policy infringes on his "right to associate with his players by forcibly segregating [him], both physically and mentally, from his players while they engage in the important team act of saying pre-game prayers." However, we find this argument unavailing.

While the Supreme Court has held that the Constitution protects certain relationships, those protected relationships require a closeness that is not present between a high school football coach and his team. The Court has not limited the protection to familial relationships, but generally the protected relationships include "marriage, the begetting and bearing of children, child rearing and education, and cohabitation with relatives." *See Bd. of Dirs. of Rotary Int'l v. Rotary Club*, 481 U.S. 537, 545 (1987) (citations omitted); *id.* at 546-47 (not extending the protection to the Rotary Club). We do not doubt that football coaches have a special relationship with the players on their team. However, the relationship is typically not so close as to involve "'not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.'" *Id.* at 545 (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 619-20 (1984)). Therefore, we find that the guidelines prohibiting him from participating in the players' prayer activities do not interfere with his freedom of association rights,

particularly because he is violating the Establishment Clause while doing so. *See infra* Part III.C.[15]

### 4. Due Process

Borden also argues that the guidelines and the Board's statement violated his rights to due process. In the context of school district policies, we have previously stated that the same

---

[15]While Borden's argument is not entirely clear, he may also be asserting an expressive association claim. To the extent that Borden makes this argument, we deem it to fail. The football team must be an "expressive association" for it to fall within the ambit of the First Amendment's protection. *See Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000). To be an "expressive association," the group does not need to be an advocacy group, but it "must engage in some form of expression, whether it be public or private." *Id.* The Supreme Court has held that the Boy Scouts engage in expressive association because the organization seeks to instill values in the youth members. *Id.* at 649-50.

Borden argues that, as a football coach, he similarly instills values in the members of his team. However, unlike the Boy Scouts in *Dale*, Borden is instilling values in the team as part of his duties as a public school employee and not as part of a private association. As discussed in part III.C of this opinion, *see infra*, the School District has the right to issue its guidelines, particularly because it needed to prevent Borden from violating the Establishment Clause. Therefore, we find any expressive association argument that Borden is attempting to make to be invalid.

38

test for vagueness applies to a procedural due process claim. *Bradley*, 910 F.2d at 1177. Thus, a rule prohibiting conduct must not be "in terms so vague that people of common intelligence must guess as to its meaning . . . ." *Id.* As indicated by the discussion above, the guidelines and the Board's statement were not unconstitutionally vague. *See supra* Part III.A.2.

Therefore, Borden must point to a fundamental right that he has which the policy infringed upon in order to establish a due process violation. He can do no such thing. Borden tries to cite to federal case law regarding privacy rights, such as *Griswold v. Connecticut*, 381 U.S. 479 (1965), and *Lawrence v. Texas*, 539 U.S. 558 (2003), to argue that the School District has intruded upon his privacy, thoughts, autonomy, desires and wishes. He claims that the School District's requirement that he not engage in taking a knee and bowing his head degraded him as a person and humiliated him in front of his team. However impassioned Borden's arguments may be, they lack any basis in the law. Borden has no interest – privacy, liberty, or otherwise – in behavior that violates the Establishment Clause.[16] For these

---

[16]Borden attempts to argue that the New Jersey Constitution provides him greater due process protections than the U.S. Constitution. Under the New Jersey Constitution, claims involving fundamental rights are to be analyzed using a balancing test, "consider[ing] the nature of the affected right, the extent to which the governmental restriction intrudes upon it, and the public need for the restriction." *Greenberg v. Kimmelman*, 494 A.2d 294, 302 (N.J. 1985). However, the balancing here has the same result as under federal

reasons, the guidelines and the Board's statement did not infringe on Borden's due process rights.

### C. The School District Had a Right to Adopt the Guidelines Because It Was Concerned About Establishment Clause Violations.

As discussed above, the School District's guidelines and the Board's statement were not unconstitutional on their face and did not violate Borden's constitutional rights. We have previously held that, where an official at a public school does not have a First Amendment right to his or her expression, the school district's policy does not need to be "reasonably related to a legitimate educational interest." *See Edwards*, 156 F.3d at 491. Thus, because Borden has no First Amendment right to his silent acts, we do not need to analyze the policy under this standard. However, even if we applied that standard to the present case, we would arrive at the same result: the School District had a right to adopt its policy.

The School District has a legitimate educational interest in avoiding Establishment Clause violations, and the guidelines are reasonably related to that interest. The Supreme Court has stated that "compliance with the Establishment Clause is a state interest sufficiently compelling to justify content-based restrictions on speech." *Pinette*, 515 U.S. at 761-62; *see also*

constitutional principles because the public need – to prohibit Establishment Clause violations, which as discussed below, are present in this case – is so great. Therefore, Borden's argument fails.

40

*Locke v. Davey*, 540 U.S. 712, 730 n.2 (2004) (Scalia, J., dissenting) ("[A] State has a compelling interest in not committing *actual* Establishment Clause violations."). If compliance with the Establishment Clause can rise to a compelling state interest, surely it is a legitimate educational interest. Moreover, the guidelines are related to that interest because, as discussed in the overbreadth and vagueness analysis, the prohibited conduct would violate the Establishment Clause. In fact, based on the history and context of Borden's conduct in coaching the EBHS football team over the past twenty-three years, Borden is in violation of the Establishment Clause when he bows his head and takes a knee while his team prays.[17]

_____

[17]The defendants suggest that we do not need to reach the issue of whether Borden's requested actions, to bow his head and take a knee while his team prays, constitute an Establishment Clause violation. Borden's complaint did not make any allegations regarding the Establishment Clause; the Establishment Clause only surfaced in the cross-motions for summary judgment to the District Court because the defendants thought that Borden was asserting a Free Exercise claim, which he was not. However, in reaching its decision, the District Court found "that the Plaintiff's request to bow his head in silence and take a knee do not violate the Establishment Clause of the Constitution." This decision was a declaratory judgment because it "declare[d] the rights and other legal relations" of the interested parties. 28 U.S.C. § 2201. The District Court was within its right to grant a declaratory judgment. *See* Fed. R. Civ. P. 57. But we must now review the district court's decision, *see* 28 U.S.C. § 2201, and in reviewing a decision to grant a declaratory judgment, "we will exercise plenary review over the

Under the Establishment Clause of the First Amendment, "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. This provision applies equally to the states, including public school systems, through the Fourteenth Amendment. *See Wallace v. Jaffree*, 472 U.S. 38, 49-50 (1985). The Supreme Court has set forth three tests for determining whether governmental action violates the Establishment Clause: the coercion test, the *Lemon* test, and the endorsement test. *Modrovich*, 385 F.3d at 400-01. We do not address whether Borden's conduct violates the Establishment Clause under the coercion[18] and *Lemon*[19] tests because we find that Borden's behavior violates the Establishment Clause under the endorsement test.

---

district court's conclusions of law." *Silverman v. Eastrich Multiple Investor Fund, L.P.*, 51 F.3d 28, 30 (3d Cir. 1995). Therefore, we find it necessary to reach the District Court's conclusion of law.

[18]The coercion test looks at whether the government is "coerc[ing] anyone to support or participate in religion or its exercise . . . ." *Lee v. Weisman*, 505 U.S. 577, 587 (1992).

[19]The *Lemon* test, named after the Supreme Court case of *Lemon v. Kurtzman*, 403 U.S. 602 (1971), established a three-prong test, holding that conduct violates the Establishment Clause "if (1) it lacks a secular purpose, (2) its primary effect either advances or inhibits religion, or (3) it fosters an excessive entanglement of government with religion." *Modrovich*, 385 F.3d at 401 (citing *Lemon*, 403 U.S. at 612-13).

42

The endorsement test applies "[i]n cases involving state participation in a religious activity." *See Santa Fe*, 530 U.S. at 308. For example, in *Santa Fe*, the leading case on prayers before high school football games, the Supreme Court used the endorsement test in considering whether a school district violated the Establishment Clause where its policy allowed a student to deliver a pre-game prayer based on a voting system. *Id.* Here, Borden, an employee of the School District as both the head football coach and a tenured teacher, would like to bow his head and take a knee while students pray. Thus, the endorsement test is applicable here because these facts involve a state employee engaging in the religious activity of students in some fashion.

The relevant question under the endorsement test is "whether a reasonable observer familiar with the history and context of the display would perceive the display as a government endorsement of religion." *Modrovich*, 385 F.3d at 401; *see also Am. Civil Liberties Union Greater Pittsburgh Chapter*, 492 U.S. at 596 (adopting the endorsement test). The test does not focus on the government's subjective purpose when behaving in a particular manner, but instead focuses on the perceptions of the reasonable observer. *Modrovich*, 385 F.3d at 401.

The history and context of Borden's prayer activities with the team, if challenged, could have been Establishment Clause violations. In a case that is similar to the facts of the present case prior to the School District's enactment of the policy, the Court of Appeals for the Fifth Circuit found that a basketball coach's involvement in prayer "signal[ed] an unconstitutional

43

endorsement of religion." *Duncanville*, 70 F.3d at 406. In *Duncanville*, a basketball coach recited the Lord's Prayer with his players during practices and after games. *Id.* at 404. Parents of the students challenged this practice, and the district court granted an injunction which prohibited "[the school district], its employees and its agents from: leading, encouraging, promoting, or participating in prayers with or among students during curricular or extracurricular activities, including before, during, or after school-related sporting events. . . . Students may voluntarily pray together, provided such prayer is not done with school participation or supervision." *Id.* at 405-06. The school district challenged the district court's injunction, arguing that this prohibition violated its employees' rights to free exercise of religion, freedom of association, freedom of speech, and academic freedom. *Id.* at 406. The Fifth Circuit disagreed, stating that the government's facilitation of the free exercise of religion or free expression rights cannot "'supersede the fundamental limitations imposed by the Establishment Clause.'" *Id.* (quoting *Lee v. Weisman*, 505 U.S. 577, 586-87 (1992)). In addition, the context of the challenged prayer activities, which occurred during "school-controlled" activities that the team must attend, demonstrated that the coaches' "actions [were] representative of [school district] policies." *Id.* Thus, the Fifth Circuit upheld the District Court's injunction, finding that the coaches' participation was "an unconstitutional endorsement of religion." *Id.*

Likewise, Borden's past conduct "signals an unconstitutional endorsement of religion." *Id.* For twenty-three years, Borden led the team in a pre-game prayer in the locker room. During that same period of time, Borden orchestrated a

44

pre-meal grace for his team. He originally had a chaplain conduct the pre-meal grace. This practice changed only after school officials asked him to stop; then he had the chaplain write the grace and he selected seniors on the team to recite it. Additionally, during at least three seasons, Borden led the team in the first prayer of the season. Both of these activities, the locker room preparations and the pre-game meals, were school-sponsored events. As in *Duncanville*, Borden's involvement in prayer at these two activities – as a participant, an organizer, and a leader – would lead a reasonable observer to conclude that he was endorsing religion.

In analyzing Borden's request to engage in silent acts with his teams, we must consider all of his prior prayer activities with his team as the Supreme Court did in *Santa Fe*. For many years, the Santa Fe Independent School District began each high school football game with a prayer led by the "Student Chaplain." *Santa Fe*, 530 U.S. at 294, 309. After realizing that such conduct would violate the Establishment Clause, the school district developed a two-step student election process, which allowed students to (1) first decide whether an invocation would be given at the beginning of a game; and (2) then elect the speaker to give the invocation. *Id.* at 306. The Supreme Court considered the many years of pre-game prayers at the school, and the evolution of the policy, including the name "Prayer at Football Games" and its stated purpose, which is to "solemniz[e]" the occasion. *Id.* at 308-09. It found that "an objective Santa Fe High School student will unquestionably perceive the inevitable pregame prayer as stamped with her school's seal of approval." *Id.* at 308. Moreover, it stated that all of these factors indicated that the purpose of the policy was

45

to preserve the popular pre-game prayer, regardless of the school district's stated purposes. *Id.* at 309. Thus, it found that the policy failed the endorsement test and violated the Establishment Clause. *Id.* at 308-10.

Similarly to *Santa Fe* and as discussed above, the current controversy is built upon a significant history of pre-game prayers that involved Borden. Borden organized prayers for the pre-meal grace at the team dinner; he had a chaplain say a prayer and then selected seniors to say the prayer. But even more importantly, Borden led prayers himself – on at least three occasions for the pre-meal grace, and before each game for twenty-three years for the locker room prayer. Additionally, when EBHS officials asked Borden to discontinue this conduct, he initially resigned from his position as coach of the team rather than continue as coach without engaging in the prayer activities. This history of Borden's prayers with the football team leads to a reasonable inference that his current requested conduct is meant "to preserve a popular 'state-sponsored religious practice'" of praying with his team prior to games. *Santa Fe*, 530 U.S. at 309 (citing *Lee*, 505 U.S. at 596).

Borden has stated that his intention in taking a knee and bowing during prayer is to show signs of respect to his team, not endorse religion.[20] Borden attempts to support this argument by

[20]As an employee of the School District as both a coach and tenured teacher, Borden's actions can be imputed to the School District. For this reason, Borden's claim that the School District could remove any Establishment Clause violation by writing a disclaimer saying that Borden's speech does not

46

pointing to language in *Duncanville*, which states that "neither the Establishment Clause nor the district court's order prevent [school district] employees from treating students' religious beliefs and practices with deference and respect; indeed, the constitution requires this. Nothing compels [school district] employees to make their non-participation vehemently obvious or to leave the room when students pray . . . ." *Duncanville*, 70 F.3d at 406 n.4.[21]

_____

represent the ideals of the School District is simply wrong. Although the Supreme Court has previously suggested disclaimers as a way to demonstrate that a school district is not endorsing religion, *see Bd. of Educ. v. Mergens*, 496 U.S. 226, 251 (1990), that was only applicable in the context of permitting student clubs of a religious nature to meet on school grounds. The Court reasoned that "there is little if any risk of official state endorsement or coercion where no formal classroom activities are involved and no school officials actively participate." *Id.* The circumstances are different where, as here, a school official could reasonably be perceived as engaging in the students' prayer activities. Therefore, a disclaimer by the School District would not remove the Establishment Clause violation.

[21]Borden also invokes the football greats, like Bear Bryant, to indicate that taking a knee is merely a gesture in the land of football. However, although taking a knee in a huddle to discuss strategy is a gesture well known to football gurus as being part of the game, Borden said a prayer while taking a knee with his team for over twenty-three years. Based on this undisputed history, a reasonable EBHS player would conclude that Borden is endorsing religion if he continues to take a knee

47

However, we find Borden's argument to be unavailing. First, the inquiry is not whether Borden intends to endorse religion, but whether a reasonable observer, with knowledge of the history and context of the display, would conclude that he is endorsing religion. *See Modrovich*, 385 F.3d at 401. Additionally, Borden fails to note that the Fifth Circuit does not permit any respectful display to pass muster in evaluating the constitutionality of the display. *See Duncanville*, 70 F.3d at 406 n.4. Instead, the Fifth Circuit, in the sentence immediately following the above quote, stated that, "if while acting in their official capacities, [school district] employees join hands in a prayer circle or otherwise manifest approval and solidarity with student religious exercises, they cross the line between respect for religion and endorsement of religion." *Id.* Thus, Borden's reliance on *Duncanville* is only partially accurate because the respectful display is permissible only if it does not "cross the line" and endorse religion.

We find that, based on the history of Borden's conduct with the team's prayers, his acts cross the line and constitute an unconstitutional endorsement of religion. Although Borden believes that he must continue to engage in these actions to demonstrate solidarity with his team, which is perhaps good for a football team's unity, we must consider whether a reasonable observer would perceive his actions as endorsing religion, not whether Borden intends to endorse religion. A reasonable observer would have knowledge of Borden's extensive involvement with the team's prayers over the past twenty-three years during which he organized, participated in, and led

while his team prays.

48

prayer.[22]   Based on this history, we hold that a reasonable observer would conclude that Borden is showing not merely respect when he bows his head and takes a knee with his teams and is instead endorsing religion.[23]

---

[22]Borden argues that the reasonable observer would also be familiar with the School District's previous treatment of religion.  He references *Pope v. East Brunswick Board of Education*, 12 F.3d 1244, 1254 (3d Cir. 1993), a case in which the School District was admonished for searching the Equal Access Act for loopholes that would allow it to deny a religious club access to the school after hours.  Borden argues that this case shows the School District's disdain for religion, and as a result, the reasonable observer would not consider his actions to be religious.  However, even if the observer knew of the School District's former problems with religious organizations, the observer would also know that for at least ten years following the *Pope* case, Borden, a school official, was involved in prayer activities at the team dinner, and even more importantly, led a team prayer before each game.  With this knowledge, the reasonable observer would view Borden's conduct as endorsing religion despite any conflicts with religious organizations that the School District had fifteen years ago.

[23]As additional evidence of an Establishment Clause violation, the defendants argue that the pre-game prayers were not truly student initiated.  They suggest that by sending the email to the team captains asking them to poll the team about the prayers and then asking for the results, Borden himself initiated the prayers.  The defendants' argument is supported by the Supreme Court's decision in *Santa Fe*, 530 U.S. at 317, which

49

Without Borden's twenty-three years of organizing, participating in, and leading prayer with his team, this conclusion would not be so clear as it presently is. We agree with Borden that bowing one's head and taking a knee can be signs of respect.[24] Thus, if a football coach, who had never engaged in prayer with his team, were to bow his head and take a knee while his team engaged in a moment of reflection or prayer, we would likely reach a different conclusion because the same history and context of endorsing religion would not be present.[25] However, in Borden's case, the conclusion we reach

---

found that a school district violated the Establishment Clause when it sponsored a student vote on student-led prayer. However, we need not make this determination because even if the pre-game prayers were truly student initiated, Borden's participation in them by bowing his head and taking a knee violate the Establishment Clause for the reasons discussed.

[24]Judge Barry agrees with this statement. *See* Con. Op. at 70 (Barry, J., concurring) (labeling Borden's actions as "silent, unobtrusive sign[s] of respect").

[25]In his concurring opinion, Judge McKee points to a picture of Borden with his team. *See* Con. Op. at 55-57 (McKee, J., concurring). In doing so, he suggests that a reasonable observer could "conclude that the coach is praying with his team - perhaps even that he is leading the team in prayer," *id.*, even if there was no history of the coach praying with his team. We cannot agree with this conclusion because this photograph, standing alone, would be insufficient to satisfy the "fact-specific, case-by-case" inquiry required. *Id.* at 2

today is clear because he organized, participated in, and led prayer activities with his team on numerous occasions for twenty-three years. Thus, a reasonable observer would conclude that he is continuing to endorse religion when he bows his head during the pre-meal grace and takes a knee with his team in the locker room while they pray.

## IV.

For all of the above reasons, we conclude that the guidelines and the Board's statement were not unconstitutional on their face, were not unconstitutional as applied to Borden, and in fact, were necessary for the School District in order to avoid Establishment Clause violations. Therefore, we will reverse the District Court's order.

---

(quoting *Modrovich*, 385 F.3d at 402). For a court to complete the required analysis, it would need to consider additional facts, including, for example: (1) Is the team engaging in a moment of silence, or is someone speaking? (2) If a person is speaking, is he saying a prayer? (3) If it is a prayer, is it a player or the coach reciting the prayer? and (4) Who decided to say the prayer? Only after knowing these facts, as well as the coach's history of prayer activities with his team, could any court make the determination required under the endorsement test.

McKEE, *Circuit Judge*, concurring.

I join Judge Fisher's lead opinion, but write separately to clarify a few points, and express a few concerns. At the outset, I emphasize that we today hold only that (i) the School District's policy is not overbroad and vague; (ii) the policy did not violate Borden's constitutional rights to free speech, freedom of association, academic freedom, or due process; and (iii) under the circumstances here, Borden's practice of bowing his head and "taking a knee" as his team prays violates the Establishment Clause.[26]

However, I do not join my colleagues' suggestion that we might reach a different result here absent Borden's 23-year history of promoting team prayer. That question is not before us, and I believe that Borden's "respectful display," *see* Con. Op., *infra*, at 69 (Barry, J., concurring), might well violate the Establishment Clause even absent his 23-year history. Similarly, I can not agree that the football team's pregame ritual can accurately be characterized as "student-initiated" prayer.

I.

In reaching our holding, the lead opinion suggests: "[I]f a football coach, who had never engaged in prayer with his team, were to bow his head and take a knee while his team engaged in a moment of reflection or prayer, we would likely

---

[26]Both of my colleagues, as well as the district court and the parties, refer to Borden's conduct as "taking a knee." Accordingly, I will also use that phrase.

52

reach a different conclusion . . . ." *Supra*, at 52; *see also* Con. Op., *infra*, at 71 (Barry, J., concurring). I am not as sure. Although I agree that would be a more difficult case, it is not clear to me that our Establishment Clause inquiry would yield a different result. "[E]very Establishment Clause challenge requires a fact-specific, case-by-case analysis." *Modrovich v. Allegheny County*, 385 F.3d 397, 402 (3d Cir. 2004). As discussed in the lead opinion, our Establishment Clause inquiry here turns on whether an objective observer would interpret Borden's proposed actions as a state endorsement of religion. *Supra*, at 38. I believe such an observer could interpret Borden's proposed actions as an endorsement of religion even absent the coach's history of promoting team prayer.

Coach Borden's suit against the School District did not seek a declaration "permitting him to pray with his players," Borden's Br. at 9, but rather "a declaration that he be allowed . . . to continue to demonstrate respect for his players by silently bowing his head and taking a knee during The Team Prayers." Compl. ¶ 18. However, as Judge Fisher's lead opinion explains, it is not Coach Borden's subjective intent that controls whether his conduct runs afoul of the Establishment Clause. Rather, the question at the heart of the endorsement test, is whether an objective observer would perceive that Borden, and by extension the School District and therefore the state, is advancing or promoting religious practice. Here, if Coach Borden silently bows his head and takes a knee as he requests, even without knowledge of Borden's 23-year history of involvement with pre-game prayer, any such observer who peered into East

Brunswick's locker room before a game would probably observe something very much like the following:[27]

---

[27]In fairness, it is important to note that when asked at oral argument, counsel for Coach Borden was not able to confirm that this picture, submitted in the School District's Reply Brief, accurately depicts the pregame prayers after the district court's grant of summary judgment. The photograph was not entered into evidence in the district court. However, it is not disputed that the coach in the picture is Coach Borden, and counsel for Borden did not claim that the picture is inaccurate. Regardless of when it was taken, it certainly appears to be what an objective observer would see if he/she were to observe the coach "silently bowing his head and taking a knee." Compl. ¶ 18. In his brief to this court, Borden states that after the district court invalidated the School District's policy, he "silently bowed his head and took a knee with his players while his players prayed before every game during the 2006 season." Borden's Br. at 3. (This photograph was downloaded from the Boston Globe web site, and is available at http://www.boston.com/sports/schools/gallery/ 11_07_06_grossfeld_prayer/) (last viewed March 12, 2008).



It would be neither surprising nor unreasonable if that observer were to conclude that the coach is praying with his team - perhaps even that he is leading the team in prayer. Such a conclusion would certainly be buttressed by knowledge of Coach Borden's history of involvement in team prayer, but the absence of that history would not necessarily yield a different result.

## II.

Another troubling consideration (which I amplify below) is that a non-religious student or one who adheres to a minority religion might feel subtle (albeit unintentional) coercion to participate in the ritual despite disagreement or discomfort with it. That raises a serious Establishment Clause issue under the Supreme Court's "coercion" test.[28]

The district court accepted the argument that the prayer that occurred after October 7, 2005, was "student-initiated." (JA 37). It clearly was not. I have no doubt that Coach Borden is a sincere and remarkably dedicated individual who cares deeply for his players. He is also a very successful coach. Unfortunately, in an apparent desire to do what he thought was

---

[28]The Supreme Court has applied the "coercion" test as well as the "endorsement" test in determining whether state action violates the Establishment Clause in the public school context. *See Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000) (applying endorsement test and coercion test); *Lee v. Weisman*, 505 U.S. 577, 592 (1992) (observing that "there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools" because "prayer exercises in public schools carry a particular risk of indirect coercion"); *Grand Rapids Sch. Dist. v. Ball*, 473 U.S. 373, 390 (1985) ("The symbolism of a union between church and state is most likely to influence children of tender years, whose experience is limited and whose beliefs consequently are the function of environment as much as of free and voluntary choice.").

56

best for his players, he lost sight of his role as a teacher in a public school.

After initiating this litigation, and prior to the start of the 2006 season, Coach Borden directed the captains to poll the football team and ask each player whether or not he wanted to "follow the same practices as last year" regarding prayer at the pregame meals and in the locker room before the games. (JA 497). The captains then personally phoned every member of the football team. Not surprisingly, given the non-anonymous nature of the poll, no player objected. Given the uproar this issue visited on the community, the players must have known how important prayer was to their coach - and no high school athlete would want to disappoint the coach, or (as I shall explain) risk incurring the communal wrath that had been visited on the unfortunate cheerleaders the year before.[29]

I am not suggesting that Coach Borden intentionally pressured his players into voting for pregame prayer ceremonies or that he wanted to manipulate the outcome. Nevertheless, these players were put in the untenable position of either compromising any opposing beliefs they may have had or going

---

[29]Moreover, the Supreme Court has held on more than one occasion that "fundamental rights may not be submitted to vote; they depend on the outcome of no elections." *West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624, 638 (1943), *quoted in Santa Fe*, 530 U.S. at 304-5. "The whole theory of viewpoint neutrality is that minority views are treated with the same respect as are majority views." *Santa Fe*, 530 U.S. at 304-05 (citation omitted).

on record (at the very least with their captains) as opposing their coach and perhaps a majority of their teammates.

Although the coach thought that the prayers would foster team unity, and even though the captains reported that all players wanted to continue the tradition, the record suggests that the reality was quite different. In the fall of 2005, Superintendent Magistro received a phone call from a "crying and overwrought" woman who identified herself as the mother of an East Brunswick football player. (JA 153-59, 451). The mother complained that her son "was extremely upset at Mr. Borden's fostering and participating in prayer amongst the football players." (*Id.* at 451). When Magistro asked why her son participated in the team prayers despite his discomfort, the mother responded that he "was fearful that if he did not go along with what was obviously the coach's desire, he would not get playing time." (*Id.*). The call was one of the factors that led to the School District policy Borden challenges.

Unfortunately, the coach appears not to have considered the possibility that the tradition he wanted to foster could be troubling for some players and possibly deter others from playing football at all. The Supreme Court addressed an analogous situation in *Lee*. There, the Court held that a public school could not force nonbelievers to choose between participating in prayer or missing their graduation ceremony.

> Attendance [at graduation] may not be required by official decree, yet it is apparent that a student is not free to absent herself from the graduation exercise in any real sense of the term "voluntary,"

58

for absence would require forfeiture of those intangible benefits which would have motivated the student through youth and all her high school years.

*Lee*, 505 U.S. at 595. Participation in high school athletics is no less important than attending one's high school graduation. Indeed, the ongoing involvement with high school athletics is undoubtedly far more important to some than a one-time graduation ceremony. High school sports have long been a central part of our communities and they shape the character of many teenagers far more than a single graduation ceremony.

Regrettably, Coach Borden as a teacher (and therefore as a state actor for purposes of the First and Fourteenth Amendments) failed to appreciate that others may not agree with his beliefs or that the religious beliefs that he held dear might be in tension with contrary (but equally valid) beliefs of some of his players. Any player who held opposing beliefs should not have had to "go along to get along" by silently participating in religious observances he disagreed with.

For, "the government may no more use social pressure to enforce orthodoxy than it may use more direct means." . . . "[W]hat to most believers may seem nothing more than a reasonable request that the nonbeliever respect their religious practices, in a school context may appear to the nonbeliever or dissenter to be an attempt to employ the machinery of the State to enforce a religious orthodoxy." . . . The constitutional

59

command will not permit the District "to exact religious conformity from a student as the price" of joining [his] classmates at a varsity football game.

*Santa Fe*, 530 U.S. at 312 (quoting *Lee*, 505 U.S. at 592, 594).

Indeed, "it is quite possible that parents of some [students] chose public education precisely so that their children would not be compelled to follow the religious beliefs of others." *ACLU v. Black Horse Pike Regional Bd. of Educ.*, 84 F.3d 1471, 1482 (3d Cir. 1996)(*en banc*). That likelihood is particularly strong here given the telephone call of at least one "overwrought" parent that Superintendent Magistro received in reaction to pregame prayers before the School District enacted the policy that is challenged here.

This does not, of course, mean that students have no right to pray; they clearly do. Whatever else it may be, prayer is a form of speech and deserves no less protection than secular speech. *Engel v. Vitale*, 370 U.S. 421, 424-25 (1962).[30] The policy the School District developed in response to the complaints about pregame prayers was an effort to protect the First Amendment liberties of *everyone* in the school community.

III.

---

[30]Such prayer does not, however, have to occur in the locker room.

60

The Supreme Court has observed that "[w]e are a religious people whose institutions presuppose a Supreme Being." *Zorach v. Clauson*, 343 U.S. 306, 313 (1952). Yet, the Court also reminds us that "[i]t is neither sacrilegious nor anti-religious to say that each separate government in this country should stay out of the business of [religion] . . . and leave . . . purely religious function[s] to the people themselves and to those the people choose to look to for religious guidance." *Engel*, 370 U.S. at 435.

Coach Borden's dedication to instilling in his players values such as respect and team unity is certainly praiseworthy. However, as we have explained, the laudable intentions of state actors do not control an analysis under the First Amendment. "For just as religion throughout history has provided spiritual comfort, guidance, and inspiration to many, it can also serve powerfully to divide societies and to exclude those whose beliefs are not in accord with particular religions or sects that have from time to time achieved dominance." *Grand Rapids Sch. Dist. v. Ball*, 473 U.S. 373, 382 (1985). This record contains powerful evidence of such division.

Superintendent Magistro testified that she received telephone calls in September 2005 from some parents of cheerleaders. They complained that their daughters were "uncomfortable" when Borden initiated a prayer at a pregame dinner. (JA 153-56). Students apparently learned of these complaints, and blamed two Jewish cheerleaders. Thereafter, those cheerleaders were publicly ridiculed by other students at athletic events, and the cheerleading squad was taunted, bullied, and booed. (JA 452 at ¶ 5). The cheerleaders were even

61

harassed and threatened on a student internet "blog." In the days following Coach Borden's resignation, several internet posts appeared under the heading, "Jewish Cheerleaders who suck!!!." The following are a few examples of the disgusting comments that were posted:

- "First they crucify Jesus, then they got Borden fired . . . . Jews gotta learn to stop ruining everything cool." (JA 460)

- "The jew is wrong. Borden is right. Let us pray." (JA 467)

- "d\*\*n jews . . . then you wonder why hitler did what he did back in the day." (JA 471)

- "MAYBE if [Borden] held a gun to the jjjjewwws head and was like b\*tch get on ur knees and pray to jesus!! then that might be breaking the law...ehhh maybe not! . . . just suck it up if u don't fu\*king like whats going on in america then GO THE FU\*K BACK TO YOUR COUNTRY AND STAY THERE AND PRAY . . . ." (JA 487-88)

- "Heil Hitla!!! sieg heill." (JA 490)[31]

--------

[31]Borden's counsel, in his brief and at oral argument, urged us to disregard evidence of parents' calls to the

Superintendent and harassment of the cheerleaders:

> [E]very assertion cited to by [the School District]
> to support every alleged parent or student
> complaint about Borden's pre-October 7, 2005[,]
> activity is based on hearsay that is derived from
> anonymous sources that the [School] District
> refused to identify. Defendants have not
> submitted a single sworn, or even unsworn,
> statement from any alleged complaining student
> or parent. Nor has the [School] District disclosed
> the name of any alleged complaining student or
> parent.

Borden's Br. at 16-17. However, given the nature of these venomous comments, counsel can not seriously suggest that the evidence be ignored merely because students and parents who opposed Coach Borden's policy were not willing to identify themselves and offer direct testimony. The situation is neither new nor unique. In *Santa Fe Independent School District v. Doe*, the Court noted that the district court permitted students and parents to litigate anonymously. 530 U.S. at 294. The opprobrium that can await those who publicly state their opposition to prayer in school is evident from the Court's opinion in *Santa Fe*:

> About a month after the complaint was filed, the
> District Court entered an order that provided in
> part: "[A]ny further attempt on the part of District
> or school administration, . . . teachers, employees

63

These exchanges illustrate the continuing relevance of Justice O'Connor's admonition that "[e]ndorsement sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." *Lynch v. Donnelly*, 465 U.S. 668, 688 (1984) (O'Connor, J., concurring). The School District attempted to address these concerns by adopting the policy that the district court struck down in the face of Coach Borden's challenge. In reversing the district court, we help to ensure the continued vitality of the Establishment Clause as well as the rights of all to worship as they please.

---

or servants of the School District, parents, students or anyone else, . . . to ferret out the identities of the Plaintiffs in this cause, by means of bogus petitions, questionnaires, individual interrogation, or downright 'snooping', will cease immediately.

*Id.* at 294 n.1 (alteration in original). The district court had to threaten contempt sanctions and criminal liability to protect the parents and students who objected to the practice of prayer at football games. *Id.*

BARRY, *Circuit Judge*, concurring.

There was no question, and the parties clearly understood, that there was one predominant issue before the District Court: whether the actions in which Borden wished to engage would violate the Establishment Clause of the First Amendment, <u>not</u> whether the conduct in which he had engaged would pass constitutional muster. Put in specific terms, the parties and the District Court focused their attention on how this public high school football coach could react, consistent with the Establishment Clause, when members of his team decide to initiate voluntary prayers at a pre-game meal attended only by players, staff, players' parents, and invited guests, and in the locker room before a game where only players and coaches are present.

Borden, for his part, represented that, whatever had gone before, he would no longer pray with the team, move his lips, join his hands with the players, or even close his eyes. Rather, the two silent actions in which he wished to engage – bowing his head and taking a knee when the team decides to pray – are to show his "personal respect" for his players and "respect for what this game entails and what they do to go out there and play and give it their all." The defendants had no problem with that. As Superintendent Magistro put it, "if the courts determine that [Borden] taking a knee, bowing his head, is appropriate, that's fine. He can do that. I think that's what this is all about." Again, "[i]f the courts come down and say Borden can bow his head, bend his knee, jump on the table, I am going to allow it." The defendants' briefs before the District Court on the cross-motions for summary judgment continued that theme. One put

65

it this way: "If this Court were to find plaintiff's actions do not implicate the Establishment Clause, then regardless of what Constitutional right plaintiff seeks relief under . . . he would be entitled to participate in voluntary, non-disruptive student prayers."

Suffice it to say that when they were before the District Court, the parties were in good faith trying to avoid an Establishment Clause problem, with defendants explicitly agreeing to abide by the District Court's decision. But defendants did not do so. Rather, now armed with new counsel, they filed an appeal, creating before us a legal landscape that bears little or no resemblance to what went on before the District Court and surely causing the temperature of this litigation to soar.

Given my druthers, I would hold defendants to their word and would not entertain, as my distinguished colleagues have so generously entertained, the new issues and arguments raised on this appeal.[32] I will not, however, tarry to push the proverbial waiver rock uphill as to all of those issues and arguments because I cannot disagree, nor does Judge McKee, with the bottom-line conclusions of Judge Fisher's superb lead opinion that "the guidelines and the Board's statement were not unconstitutional on their face, were not unconstitutional as

---

[32]I would find, for example, that defendants have waived the argument that numerous pedagogical reasons justified the directives and not just fear of litigation and the argument that Borden has no constitutional rights which would limit defendants' exercise of their discretion.

66

applied to Borden, and in fact, were necessary for the School District in order to avoid Establishment Clause violations." These conclusions are "threshold question[s] necessary to a proper analysis of the parties' [Establishment Clause] arguments," before us and so, even if not adequately raised before the District Court, it is appropriate that we consider them. See Tenafly Eruv Ass'n Inc. v. Borough of Tenafly, 309 F.3d 144, 158 n.15 (3d Cir. 2002).

I write separately, however, to express my view that whether or not Borden's past prayer activities with the team signaled an unconstitutional endorsement of religion – and I have little doubt that they did – a reasonable observer would not conclude that the "respectful display" he proposes would violate the Establishment Clause. The lead opinion concludes, in its additional, albeit unnecessary, "hold[ing]," that that display would "cross the line." It does so, however, as does Judge McKee's concurring opinion, by having the reasonable observer look only at Borden's twenty-three years of history with the team's prayers and the context of the display he proposes.[33] Yet a reasonable observer would not only have knowledge of that history, but would know of all that has taken place leading up to

_____

[33]Judge McKee has included in his concurring opinion a picture of unknown date that is not in evidence in this case and thus, in my view, not appropriately considered by us. Having lost that battle, I agree with Judge Fisher's assessment of the picture and what more would be needed before a reasonable observer could reach the conclusion that Borden was, in fact, praying, a conclusion reached by Judge McKee based on the picture alone. See Lead Op. at n.25.

67

and during this litigation and know that Borden, under oath, has represented what he will and will not do and that he merely wishes to show respect for his players when they pray. A reasonable observer would have no reason to believe that Borden was lying.

Moreover, given the limited number of attendees at the pre-game meal, it is fair to say that a reasonable observer of a prayer before that event would be a player, coach, parent, or invited guest, and a reasonable observer when the team takes a knee for a pre-game prayer in the locker room would be a player or a coach, just as in Santa Fe the observer was "an objective Santa Fe High School student." Santa Fe Ind. Sch. Dist. v. Doe, 530 U.S. 290, 308 (2000). Thus, if and when in the future a player decides to initiate prayer, the reasonable observer would know, given Borden's representations, that he did not ask for a prayer; did not select someone to say a prayer; did not monitor the content of the prayer; did not provide a means for broadcasting the prayer; did not join his hands with anyone; and did not mouth the words of the prayer, or say it aloud, or otherwise do anything to put the imprint of the state on the prayer. A reasonable observer would simply see Borden bow his head or take a knee in a silent, unobtrusive sign of respect for the private choices made by individual players who are constitutionally permitted to choose to engage in religious activities. See, e.g., Zelman v. Simmons-Harris, 536 U.S. 639, 649-55 (2002); Bd. of Educ. of Westside Cmty. Sch. v. Mergens, 496 U.S. 226, 251-52 (1990); Child Evangelism Fellowship of N.J. Inc. v. Stafford Twp. Sch. Dist., 386 F.3d 514, 531 (3d Cir. 2004).

My colleagues and I do not disagree that bowing one's head and taking a knee can be signs of respect; indeed, Judge Fisher "would likely" find, as would I, <u>no</u> endorsement of religion were a football coach, who had never engaged in prayer with his team, to bow his head or take a knee while his team engaged in a moment of reflection or prayer. Apparently, it is only Borden, given his prior history, who cannot constitutionally respond to constitutionally protected student-initiated and student-composed prayer but, if he can, we are not told what response might be permissible. Surely he would not be required to keep his head erect or turn his back or stand and walk away.[34] Any such requirement would evidence a hostility to religion that no one would intend.

This is a difficult and close case, complicated by the fact that, unlike the vast majority of Establishment Clause cases which are brought by plaintiffs complaining of a state's actions, this case was brought by an employee of a state complaining about pre-emptive action taken by the state in its attempt to avoid an Establishment Clause problem. With this litigation hopefully nearing its end, one also hopes that those involved

---

[34] One wonders how a court can dictate, beyond a certain point, what response is permissible, much less how a response would be enforced. Defendants told the District Court that Borden can bow his head, but he cannot do "a pronounced bowing of the head." What is "pronounced," and who would decide that question? As defendants also told the District Court, "The district does not have thought police, and we certainly don't have bow police."

will move forward as a team for the benefit of the young people who look to them for guidance and support.