**Shirley GRAHAM, Appellant,**

v.

**ATLANTIC RICHFIELD COMPANY, Appellee.**

**No. 13-91-417-CV.**

Court of Appeals of Texas, Corpus Christi.

Jan. 14, 1993.

Rehearing Overruled Feb. 25, 1993.

John C. Maher, Jr., Stanley & Maher, Houston, for appellant.

A. Martin Wickliff, Jr., Barbara L. Johnson, Wickliff & Hall, William Book, Houston, for appellee.

Before GILBERTO HINOJOSA, DORSEY and FEDERICO G. HINOJOSA, Jr., JJ.

## OPINION

GILBERTO HINOJOSA, Justice.

Appellant, Shirley Graham, sued appellee, Atlantic Richfield Company (ARCO), for negligence. At the close of Graham's case in chief, ARCO moved for a directed verdict. Ruling that ARCO owed no duty to Graham, the trial court granted the motion for directed verdict against her. On appeal, Graham challenges this ruling by one point of error. The primary issue is whether a premise owner or occupier owes a duty to employees of contractors working at its facilities to provide a work place free of sexual harassment. We affirm.

Shirley Graham worked from 1981 until September 11, 1987 for Greenwade Services, Inc., a company providing janitorial services. Mrs. Graham was in her fifties at the time of this suit, and all her life she had worked in restaurants and other low paying jobs. Greenwade Services, Inc., had contracted with ARCO, appellee, of Houston, Texas, and it was on ARCO premises

that Mrs. Graham performed her cleaning duties. It was also on ARCO premises that one of ARCO's employees, Jimmy Epperson, allegedly subjected Mrs. Graham to continual verbal abuse and sexual harassment.

In the underlying suit, Mrs. Graham claimed that ARCO, the premise owner or occupier, owed to all persons a duty to maintain a work environment free of sexual harassment and abusive conduct by its employees.[1] Granting ARCO's motion for directed verdict, the trial court stated that there was no basis in common law to impose such a duty.

Mrs. Graham testified that, over the course of her six years of employment with Greenwade Service, Inc., Epperson made numerous sexual advances toward her. Epperson was married at the time of the events in question. Prior to April 14, 1987, on several occasions he asked her to go out for a drink or on a date. Mrs. Graham testified that on one occasion he drove up to her while she was walking down the road and asked if she "wanted to go to the warehouse and have a good time." She further testified that on another occasion he drove up to the warehouse and called her over, and when she again refused his invitation to "go out," he pointed to his "private parts" and said, "See what it does to me just to think about it." On yet another occasion, Epperson followed Graham into the Greenwade Services, Inc., supply trailer and suggested that it would be a good place to "play around" where no one would know about it. Mrs. Graham testified that after this incident she locked the trailer door when she went inside, but that Epperson continued to try to get in and hollered that she open the door.

Mrs. Graham stated that in late 1986 or early 1987, Epperson started following her around, looking at his watch, and taking notes. It was about the same time that she had refused to wax a floor per Epperson's request because, she testified, she believed it was the night shift's duty.

Mrs. Graham testified that she considered these remarks and occurrences unwelcome offers to have sex, and that they made her feel degraded and "terrible." It is undisputed that at no time did Epperson touch or even attempt to touch Mrs. Graham. However, Mrs. Graham stated that Epperson's conduct interfered with her ability to safely and satisfactorily perform her job. The record does not show that she suffered any physical ailments or sought medical or psychiatric assistance as an immediate result of Epperson's conduct.

On July 30, 1987, Mrs. Graham reported Epperson's conduct for the first time to the ARCO Human Relations department. Although Epperson had not been the subject of any prior complaints to the Human Relations Department, there was testimony that some female employees felt uncomfortable around him because he was "a little too friendly." Mrs. Graham testified that at no time was she advised to speak to her supervisor at Greenwade Services, Inc.

Even though Mrs. Graham made several subsequent visits to the same office and was assured each time that the problem would be taken care of, she stated that Epperson continued to follow her around and take notes for the remaining month and a half of her employment. It is undisputed, however, that by the time Mrs. Graham reported Epperson to the Human Relations department, he had discontinued making any remarks to her, derogatory or otherwise.

Epperson's supervisor testified that, immediately after Mrs. Graham complained, an ARCO Human Relations representative told him that a sexual harassment complaint involving Epperson had been made, and that it would be pursued with ARCO's legal department. Epperson's supervisor further testified that no action against Epperson was ever taken, but that ARCO did show a film on sexual harassment to supervisors in general.

1. Several questions are not presented in this case. For example, the issue of whether ARCO violated a duty imposed by statute is not presented. Nor is the issue of whether ARCO assumed a duty to act according to a particular standard of care. Neither of these theories were pleaded, and we expressly limit this decision to the issue discussed, and no others.

Prior to 1987, Mrs. Graham's work record was exemplary. During her six years with Greenwade Services, Inc., her wage increased from $5.00 per hour to $7.50 per hour, and she was promoted to foreman. But in early to mid 1987 she began to receive a few minor informal reprimands. Most of the reprimands were the result of complaints by ARCO employees working under Epperson. Then on July 24, 1987, Mrs. Graham received a "written counseling report" from Greenwade Services, Inc., stating that she spent considerable time socializing and engaged in other "non-work related activities" during working hours and within the view of other employees. The primary offensive non-work related activity was Mrs. Graham's cake business, in which she received orders from, and baked cakes for, many ARCO employees.

A short time after Mrs. Graham's written reprimand, her supervisor, Skip Greenwade, became aware of her business card that listed her work phone number on ARCO premises. As a result of this new information, Greenwade Services, Inc., decided to transfer Mrs. Graham to a different wing of the ARCO plant where she would have worked the night shift and would have been under direct supervision. Because she could not see well at night to drive, and because the demotion caused a reduction in pay, Mrs. Graham refused to comply with the transfer. As a result, after six years of dedicated work, Mrs. Graham was terminated on September 11, 1987. The undisputed evidence showed that Greenwade did not discover Epperson's sexual harassment until after Mrs. Graham was fired.

Mrs. Graham testified that after she was fired she moped around and cried a lot, and that she felt uneasy every time she drove by ARCO, because she had worked very hard and was fired for something she did not do. She testified that she had not looked for a job for fear of the same thing happening again. She testified on direct examination that her high blood pressure and asthma were adversely affected, and that she threw up a lot. But on cross examination she testified that she simply felt sort of sick in the stomach when she would pass an ARCO plant. Mrs. Graham never sought medical or psychiatric attention for the above ailments.

Mrs. Graham filed suit against Greenwade Services, Inc., Jimmy Epperson and ARCO. Greenwade Services, Inc., and Epperson were non-suited. Mrs. Graham's live pleadings alleged that ARCO had the duty to maintain a work environment for all persons free of sexual harassment and abusive conduct by its employees, and that it breached its duties by failing to do so. Mrs. Graham also alleged that ARCO had a duty to investigate the claims of sexual harassment and had breached that duty by failing to do so. At the close of Mrs. Graham's case in chief, ARCO moved for a directed verdict, arguing that Mrs. Graham had not established that Atlantic Richfield owed her any duty of care. Ruling that there was no such common law duty, the trial court granted the motion.

By one point of error, Mrs. Graham appeals this ruling. Citing classic slip and fall premise liability cases, she argues that ARCO, because it is the owner and occupier of the premises, owed a duty to employees of contractors working at ARCO's facilities to provide a safe place to work and to reduce or eliminate those conditions that pose an unreasonable risk of harm to employees of contractors working at ARCO's facilities. *Zaborowske v. OES, Inc.*, 731 S.W.2d 614, 616 (Tex.App.—Houston [1st Dist.] 1987, no writ); *Joachimi v. City of Houston*, 712 S.W.2d 861 (Tex.App.—Houston [1st Dist.] 1986, no writ). We overrule her point of error because the conduct creating the "dangerous condition" was an unforeseeable intentional tort; it was the sole intervening cause of any injuries suffered by Mrs. Graham as a matter of law.

The de novo review is the proper standard to be employed by an appellate court in reviewing a trial court's directed verdict based on non-evidentiary grounds. *McCarley v. Hopkins*, 687 S.W.2d 510, 512 (Tex.App.—Houston [1st Dist.] 1985, no writ). One way in which a directed verdict is proper is when the law applied to the undisputed facts mandates a particular re-

sult. *See Id.;* Hall, Standards of Appellate Review in Civil Appeals, 21 St. Mary's L.J. 865, 893 (1990). And if a trial court's judgment on a directed verdict can be sustained by any theory of law involved, leaving no issue of fact for the jury, a court of appeals may not disturb the judgment. *Hines v. Massachusetts Mut. Life Ins. Co.,* 174 S.W.2d 94 (Tex.Civ.App.—Ft. Worth 1943, no writ).

■ The threshold inquiry in a negligence case is duty. *El Chico Corp. v. Poole,* 732 S.W.2d 306, 311 (Tex.1987). The existence of a duty is a question of law for the court to decide from the facts surrounding the occurrence in question. *Greater Houston Transportation Co. v. Phillips,* 801 S.W.2d 523 (Tex.1990). The question of duty turns on the foreseeability of harmful consequences, which is the underlying basis for negligence. *Corbin v. Safeway Stores, Inc.,* 648 S.W.2d 292, 296 (Tex.1983).

■ In Texas, the duty owed by a premise owner or occupier is determined by the status of the complaining party. An "invitee" is "one who enters on another's land with the owner's knowledge and for the mutual benefit of both." *See Rosas v. Buddies Food Store,* 518 S.W.2d 534, 536 (Tex.1975); *Boyer v. Scruggs,* 806 S.W.2d 941, 944 (Tex.App.—Corpus Christi 1991, no writ). Generally, a premise owner or occupier owes to invitees a duty to use reasonable care to protect them from foreseeable injuries. *See Boyer v. Scruggs,* 806 S.W.2d at 944–45.

■ However, a premise owner or occupier is not an insurer of the safety of his invitees. *Garner v. McGinty,* 771 S.W.2d 242 (Tex.App.—Austin 1989, no writ); Prosser & Keeton, Law of Torts § 61, at 425 (5th ed. 1984). Because criminal and tortious conduct of third persons is not necessarily foreseeable to a reasonably prudent landowner, such conduct is usually a superseding cause relieving a negligent landowner from liability. *Nixon v. Mr. Property Management,* 690 S.W.2d 546, 550 (Tex.1985).

■ The determination of whether a third person's tortious or criminal conduct relieves a negligent landowner of liability is a three step analysis. The threshold determination is whether the third person's conduct is in fact a superseding act. RESTATEMENT (SECOND) OF TORTS § 442 (1965). If it is not a superseding act, then the landowner will not be relieved of liability. However, if it is a superseding act, then the next question is whether it is a *foreseeable* superseding act. There are two prongs to this question, specific and general. Specifically, did the landowner realize or should it have realized the likelihood that such a situation might be created, and that this particular third person might avail himself of the opportunity to commit such a tort or crime? RESTATEMENT (SECOND) OF TORTS § 448 (1965). And, generally, did the landowner know or have reason to know from past experience of a likelihood of conduct on the part of third persons in general which would endanger the safety of invitees? RESTATEMENT (SECOND) OF TORTS ·§ 344 (1965). If the answer to either of the last two questions is in the affirmative, then the superseding act was foreseeable to the landowner. And, thus, the negligent landowner will not be excused from liability despite the superseding act by a third person. Conversely, if the superseding act was not generally or specifically foreseeable, then even a negligent landowner is relieved of liability. *Nixon v. Mr. Property Management,* 690 S.W.2d at 550.

The RESTATEMENT (SECOND) OF TORTS § 442 (1965) lists the following considerations for determining whether the intervening act of a third person is a superseding cause of harm to another:

(a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;

(b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operations;

(c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or,

on the other hand, is or is not a normal result of such a situation;

(d) the fact that the operation of the intervening force is due to a third person's act or his failure to act;

(e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;

(f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.

An intentional tort or crime of a third party is not a superseding cause relieving a negligent landowner from liability if the landowner "at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime." RESTATEMENT (SECOND) OF TORTS § 448 (1965). The most common instance in which criminal or tortious conduct is the foreseeable result of a landowner's negligence is when prior incidents of the same general character have occurred. Comment f of the RESTATEMENT (SECOND) OF TORTS § 344 (1965) states that an invitor is subject to liability if someone on the premises is physically harmed by a third person and the invitor knows or has reason to know, "from past experience, that there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of an invitee, even though the invitor has no reason to expect it on the part of any particular individual."

For example, in *Nixon v. Mr. Property Management*, the Supreme Court of Texas reversed a summary judgment in favor of a landowner, determining that there was a material fact issue on foreseeability. *Nixon v. Mr. Property Management*, 690 S.W.2d at 550. The evidence showed that the landowner failed to secure windows on an empty apartment building, and as a result, a criminal was able to enter and use the apartment to rape a child who resided at a neighboring apartment building. The fact issue of foreseeability arose because the evidence was replete with instances of prior violent crimes occurring at the apartments. *Id.* It was not necessary that prior rapes had occurred at the apartments, as long as the injury complained of was of such a general character as might reasonably have been anticipated. *Id.*

Another application of this rule is found in *Garner v. McGinty*, 771 S.W.2d 242. In *Garner*, the plaintiff sued the owner of a hair salon for negligence in failing to protect him against the criminal attack of a third person while he was on the premises. The plaintiff suffered hearing damage from the discharge of a gun near his head in the course of a robbery. The evidence showed that defendant advised her employees how they should respond in the event of a robbery. One burglary and one break-in had occurred more than two years before plaintiff was injured, and a burglary at another business in the same shopping center had occurred three-or-four months before plaintiff was injured. Granting an instructed verdict that the plaintiff take nothing, the trial court noted, among other reasons, that there was no evidence that the defendant's negligence was a proximate cause of the plaintiff's damages.

In affirming the judgment of the trial court, the Court held that a business invitor owes a duty to his business invitees to take reasonable steps to protect them from intentional injuries caused by third parties if he knows or has reason to know, from what he has observed or from past experience, that criminal acts are likely to occur, either generally or at some particular time. *Id.* at 246. Although it used the more inclusive "totality of the circumstances" standard, the Court found that there was insufficient evidence to raise a genuine issue of material fact regarding foreseeability. *Id.* at 248. The Court stated that only the three-or-four month-old burglary merited concern on the part of a cautious invitor and that, at best, the evidence cumulated to show a reason to know that criminal activity *might* occur. *Id.*

We believe the case at hand is governed by the general rule that a premises owner

is not legally responsible to protect an invitee against the unforeseeable criminal or intentionally tortious acts of third parties. Mrs. Graham was clearly an invitee because she entered on ARCO's land with its knowledge and for the mutual benefit of both. *See Rosas v. Buddies Food Store,* 518 S.W.2d at 536; *Boyer v. Scruggs,* 806 S.W.2d at 944. Therefore, ARCO owed her a duty to use reasonable care to protect her from foreseeable injuries. *See Boyer v. Scruggs,* 806 S.W.2d at 944–45. However, ARCO was not an insurer of her safety. *Garner v. McGinty,* 771 S.W.2d 242; Prosser & Keeton, § 61, at 425. Because Epperson's tortious conduct was unforeseeable to ARCO, ARCO owed no duty to Mrs. Graham to protect her from his conduct.

In our three-step analysis, we first must determine whether Epperson's conduct was a superseding act. Applying the principles expressed in § 442 of the RESTATEMENT (SECOND) OF TORTS (1965) to the facts of this case, we conclude that Epperson's acts were a superseding cause of Mrs. Graham's complaints because: 1) Epperson's acts were not a normal result of the employment situation created by ARCO; 2) the force which injured Mrs. Graham was due to Epperson's actions, and not those of ARCO; 3) Epperson's acts were wrongful toward Mrs. Graham and possibly could subject him to liability; and 4) the degree of Epperson's culpability was high because an intentional tort was involved.

Next, we must determine whether Epperson's superseding conduct was foreseeable to ARCO, either specifically or generally. We conclude that Epperson's conduct was not a specific foreseeable cause. Applying the RESTATEMENT (SECOND) OF TORTS § 448 (1965) to the facts at hand, we conclude that Epperson's conduct would supersede any negligence on the part of ARCO because it did not realize nor should it have realized the likelihood that he would avail himself of any opportunity to sexually or verbally harass any of the employees on its premises. By the time Mrs. Graham complained to the Human Resources depart-

ment, Epperson's offensive conduct had essentially ceased. Even though there was evidence that Epperson made some of the female employees feel uncomfortable, there was no evidence that any supervisors or other responsible parties were aware of this reputation.

We also conclude that, generally, ARCO did not owe Mrs. Graham a duty to take reasonable steps to protect her from intentional injuries caused by Epperson because it did not know, nor had reason to know from past experience, that such acts were likely to occur, either generally or at some particular time. RESTATEMENT (SECOND) OF TORTS § 344 (1965). The record is void of any evidence that the ARCO facility in question had a history of sexual or verbal harassment. Prior lawsuits or sexual harassment claims in general were not introduced into evidence. No problems with regard to inadequate training were alleged. In sum, the normal employment situation at ARCO did not lend itself to the commission of intentional torts such that ARCO should have realized conduct like Epperson's was likely to occur. At most, ARCO knew that intentionally tortious conduct *might* occur.[2] However, that a tortious activity *might* occur is not sufficient to create a duty to take precautions against harm intentionally inflicted on invitees. *Garner v. McGinty,* 771 S.W.2d at 248.

Appellant's sole point of error is overruled. The trial court's judgment is AFFIRMED.

---

2. ARCO had a standing policy regarding sexual harassment, suggesting it knew that sexual harassment might occur.