

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| WENDEE LONG, | § | No. 08-13-00334-CR |
| | § | |
| Appellant, | § | Appeal from the |
| | § | |
| v. | § | 367th Judicial District Court |
| | § | |
| THE STATE OF TEXAS, | § | of Denton County, Texas |
| | § | |
| Appellee. | § | (TC# F-2013-1478-E) |
| | § | |

**O P I N I O N**

The issue in this case of first impression is whether the following incidents constitute crimes under Texas's criminal wiretap statute: the surreptitious recording—later disclosed to a third party—of a public high school basketball coach's half-time and post-game speeches to his team in the visiting locker room of a public high school. In essence, a person violates the wiretap statute by intentionally recording, or intentionally disclosing the contents of, a "wire, oral, or electronic communication." *See* TEX.PENAL CODE ANN. § 16.02(b)(1), (b)(2)(West Supp. 2014). For purposes of the wiretap statute, an "oral communication" is one "uttered by a person *exhibiting an expectation that the communication is not subject to interception under circumstances justifying that expectation*." [Emphasis added]. *See* TEX.PENAL CODE ANN. § 16.02(a); TEX.CODE CRIM.PROC.ANN. art. 18.20, § 1(2)(West 2015). The threshold question, as framed by

the parties, is whether the coach had a *reasonable expectation of privacy under the circumstances*. We conclude that he did not and, therefore, that the recordings in dispute are not "oral communications" covered by Section 16.02 of the Texas Penal Code, the statute used to convict Wendee Long. Accordingly, we reverse Long's conviction and render judgment acquitting her of the charged offense.

## FACTUAL AND PROCEDURAL BACKGROUND

Lelon "Skip" Townsend was hired in 2011 to coach the Argyle High School girls' basketball team. Townsend was, in his own words, an intense coach, who preached discipline and accountability. Not surprisingly, reports of Townsend berating and belittling players in practice began surfacing the following school year. Long, a member of the Argyle School Board, was concerned about the reports, and she grew increasingly concerned when parents began contacting her to complain of Townsend's treatment of their children. Long's daughter had also been a member of the basketball team before quitting after the first regular season game.

On February 7, 2012, the Argyle High School girls' basketball team traveled to Sanger to play the Sanger High School girls' basketball team for the district title. Long's daughter attended the game as a spectator and, with the assistance of a Sanger student, obtained access to the visiting locker room before halftime for the purpose of surreptitiously videotaping Townsend. Long's daughter taped an iPhone to the inside of a locker and set it to record. The iPhone captured an audio and video recording of Townsend's half-time speech[1] and an audio recording of

---

[1] Townsend's half-time speech was nine minutes in length. However, the recording introduced into evidence at trial depicted only the last two minutes. It appears that Long's daughter accidentally erased the first seven minutes of Townsend's half-time speech when she attempted to email the recording after retrieving the iPhone from the locker. Dissatisfied with the recording of the half-time speech, her daughter went back into the locker room "to get the end of game speech."

2

Townsend's post-game speech[2].

In March 2012, Long showed the recordings, which were on her computer at work, to her assistant principal.[3] Later that month, Long mailed the recordings to the other members of Argyle School Board, and the recordings were distributed to the Board on the night of the meeting to consider Townsend's probationary contract. A few days later, the Superintendent of the Argyle Independent School District turned over the recordings to the police. A detective with the Sanger Police Department eventually traced the recordings to Long and her daughter.

Long was charged in a two-count indictment with, *inter alia*, violating Sections 16.02(b)(1) and (b)(2) of the Texas Penal Code.[4] Section 16.02(b)(1) provides that a person commits an offense if she: "intentionally intercepts, endeavors to intercept, or procures another person to intercept or endeavor to intercept a wire, oral, or electronic communication." TEX.PENAL CODE ANN. § 16.02(b)(1). Section 16.02(b)(2) makes it a crime to: "intentionally disclose[] or endeavor[] to disclose to another person the contents of a wire, oral, or electronic communication if the person knows or has reason to know the information was obtained through the interception of a wire, oral, or electronic communication in violating of . . . [Subsection (b)]." TEX. PENAL CODE ANN. § 16.02(b)(2).

The State alleged Long violated Section 16.02(b)(1) by procuring her daughter to record Townsend's speeches and Section 16.02(b)(2) by showing the recording to her assistant principal.

---

[2] Because the iPhone fell inside the locker room sometime after Townsend's half-time speech but before his post-game speech, it was unable to capture an audio/visual recording of the post-game speech. Only the audio portion of the speech was recorded.

[3] Long was the principal of Wayside Middle School in Saginaw, Texas.

[4] Long was also charged with, and tried for, improper photography or visual recording under Section 21.15 of the Texas Penal Code. *See* TEX.PENAL CODE ANN. § 21.15(b)(West 2011). The jury, however, found her not guilty on that count.

The jury agreed, finding Long guilty. In accordance with the parties' plea-bargain agreement, the trial court sentenced Long to five years' confinement, probated for three years, and assessed a $1,000.00 fine.

On appeal, Long raises four issues for our review. In her second issue, she challenges the sufficiency of the evidence to sustain her conviction. In her first, third, and fourth issues, respectively, she asserts that the trial court erred in overruling her motions for directed verdict, for judgment of acquittal, and for a new trial. Although Long enumerates four issues, all rest on the premise that she committed no crime because, as a matter of law, Townsend "had no justifiable expectation that only his students would acquire the contents of his communication."

## REASONABLE EXPECTATION OF PRIVACY UNDER THE CIRCUMSTANCES

As mentioned in the preceding paragraph, Long moved for a directed verdict at trial and for a judgment of acquittal after trial. The basis for both motions was the argument that Townsend had no reasonable expectation of privacy, nor a justifiable expectation that his communication was not subject to interception, because his lecture to the team was public speech, which is subject to lawful recording regardless of where it occurs. In her appellate briefing, Long contends that the trial court erred in overruling her motions for directed verdict and for judgment of acquittal because, under the circumstances, Townsend had no reasonable expectation that his intercepted communication was private. We agree.

### *Standard of Review*

Both parties acknowledge that a trial court's ruling on a motion for directed verdict or judgment of acquittal based on a question of law is subject to *de novo* review on appeal. *See Graham v. Atl. Richfield Co.*, 848 S.W.2d 747, 750 (Tex.App.--Corpus Christi 1993, writ

4

denied)(*de novo* review is the proper standard to be employed by an appellate court in reviewing a trial court's directed verdict based on non-evidentiary grounds); *Johnson v. State*, 954 S.W.2d 770, 771 (Tex.Crim.App. 1997)(question of law are subject to *de novo* review). A directed verdict is proper when the law applied to the undisputed facts mandates a particular result. *Graham*, 848 S.W.2d at 750. Here, the question of law is whether Townsend had a reasonable expectation of privacy in his speeches. To answer that question, we turn to the concept of privacy espoused in federal law.

### *Applicable Law*

It is beyond dispute that the Texas criminal wiretap statute, Section 16.02, is substantially similar to the federal one on which it is modeled, the Wiretap Act, codified as 18 U.S.C. §§ 2510-2521.[5] *See Alameda v. State*, 235 S.W.3d 218, 220, 222 (Tex.Crim.App.), *cert. denied*, 552 U.S. 1029, 128 S.Ct. 629, 169 L.Ed.2d 406 (2007)(recognizing similarity); *Meyer v. State*, 78 S.W.3d 505, 509 (Tex.App.--Austin 2002, pet. ref'd)(same). Indeed, the respective definitions of "oral communication" in both statutes are comparable. *Compare* 18 U.S.C. § 2510(2)(defining "oral communication" as "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation, but such term does not include any electronic communication."), *with* TEX.CODE CRIM.PROC.ANN. art. 18.20, § 1(2)(defining "oral communication" as "any oral communication

---

[5] The Wiretap Act was enacted in 1968 as Title III of The Omnibus Crime Control and Safe Streets Act of 1968. Pub.L. 90-351. In 1986, it was amended by the Electronic Communications Privacy Act of 1986 (hereinafter, the "ECPA") to include electronic communication as well as oral and written communications. *See generally* Act of October 21, 1986, Pub.L. No. 99-508, 100 Stat. 1848. In turn, the ECPA was amended by the following statutes: (1) the Communications Assistance for Law Enforcement Act—*see generally* Act of October 25, 1994, Pub.L. 103-414, 108 Stat. 4279—(2) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001—*see generally* Act of October 26, 2001, Pub.L. 107-56, 115 Stat. 272—(3) the USA PATRIOT Improvement and Reauthorization Act of 2005—*see generally* Act of March 9, 2006, Pub.L. 109-177, 120 Stat. 192—and (4) the FISA Amendments Act of 2008—*see generally* Act of July 10, 2008 Pub.L. 110-261, 122 Stat. 2436.

uttered by a person exhibiting an expectation that the communication is not subject to interception under circumstances justifying that expectation. The term does not include any electronic communication."). It is also beyond dispute that, in interpreting Section 16.02, we may rely on decisions from other state courts and federal courts construing the Wiretap Act. *See Alameda*, 235 S.W.3d at 18; *Meyer*, 78 S.W.3d at 509.

The legislative history of the Wiretap Act reveals that Congress's intent was to protect persons engaged in oral communications under circumstances justifying an expectation of privacy. *United States v. McIntyre*, 582 F.2d 1221, 1223 (9th Cir. 1978). Thus, to determine whether a person had a reasonable expectation of privacy in his speech, we employ a two-prong test: (1) did the person exhibit a subjective expectation of privacy; and (2), if so, is that subjective expectation one society is willing to recognize as reasonable. *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979); *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex.Crim.App. 1996). That determination is made on a case-by-case basis and is highly fact determinative. Given the great variety of work environments in the public sector, the question whether an employee has a reasonable expectation of privacy must be addressed on a case-by-case basis. *O'Connor v. Ortega*, 480 U.S. 709, 718, 107 S. Ct. 1492, 1498, 94 L. Ed. 2d 714 (1987).

### *Discussion*

Based on the application of existing authority to the evidence adduced at trial, we conclude that Townsend did not have a reasonable expectation of privacy in his half-time and post-game speeches to his players.

It is widely accepted that a public school teacher has no reasonable expectation of privacy in a classroom setting. *See Roberts v. Houston Indep. Sch. Dist.*, 788 S.W.2d 107

6

(Tex.App.--Houston [1st Dist.] 1990, writ denied); *Plock v. Bd. of Educ. of Freeport Sch. Dist. No. 145*, 545 F. Supp. 2d 755 (N.D. Ill. 2007); *Evens v. Super. Ct. of L.A. County*, 77 Cal.App.4th 320, 91 Cal.Rptr.2d 497 (1999). In *Roberts*, the court held that a public school teacher had no legal complaint against a school district for audiotaping and videotaping her classroom performance because a teacher has no reasonable expectation of privacy while teaching in a public classroom. 788 S.W.2d at 111. There, the school district's assessment team videotaped a teacher's classroom performance, with the teacher's knowledge but over her objection. *Id.* at 108. After reviewing the videotape, the assessment team recommended that the school district terminate the teacher for incompetence and inefficiency. *Id.* The school district notified the teacher of her impending termination. *Id.* at 108-09. The teacher contested the proposed termination, and the school board held a hearing and considered evidence, including excerpts from the videotapes. *Id.* at 109. The teacher sued for invasion of privacy. *Id.* at 109. The court rejected her claim on the basis that she had not demonstrated "that she had a 'reasonable expectation of privacy' in her public classroom." *Id.* at 111. In reaching this conclusion, the court reasoned that "the activity of teaching in a public classroom does not fall within the expected zone of privacy" because "[t]here is no invasion of the right of privacy when one's movements are exposed to public views generally." *Id.* The court noted that the teacher "was videotaped in a public classroom, in full view of her students, faculty members, and administrators [and] [a]t no point, did the school district attempt to record [the teacher's] private affairs." *Id.*

In *Plock*, the federal district court held that special education teachers could not enjoin the school district from installing audio/visual recording equipment in their classrooms because the teachers had no reasonable expectation of privacy in communications in their classrooms. *Id.* at

7

758. There, the teachers claimed that the proposed audio monitoring of their classrooms through audio/visual equipment would violate their Fourth Amendment right to be free unreasonable searches and seizure. *Plock*, 545 F.Supp.2d at 756. The court rejected the teachers' claim on the basis that any expectation of privacy in communications taking place in classrooms that are open to the public was inherently unreasonable because the classrooms were not solely reserved for the teachers' exclusive, private use. *Id*. at 758. In reaching this conclusion, the court reasoned that communications in a public classroom are not private because "[w]hat is said and done in a public classroom is not merely liable to being overheard and repeated, but is likely to be overheard and repeated." *Id*. The court did acknowledge, however, that "a teacher's personal office space," including his or her desk and locked file cabinets, "could conceivably be reserved for the teacher's exclusive use, giving rise to an expectation of privacy which society is willing to recognize as reasonable." *Id.* at 757.

In *Evens*, the court held that California's privacy laws do not prohibit school officials from using an illegal videotape recording of a teacher in disciplinary actions because the privacy laws did not expressly prohibit that type of use and because the recording in issue was not the type of "confidential communication" protected by the privacy laws. 77 Cal.App.4th at 323-24, 91 Cal.Rptr.2d at 498-99. There, two students surreptitiously videotaped a public high school science teacher in her classroom and delivered it to the school board and district. *Id*. at 322, 91 Cal.Rptr.2d at 498. The teacher sought a judicial declaration that state statutes prohibited these entities from viewing the videotapes because evidence obtained as a result of unconsented recordings cannot be used in any administrative or judicial proceeding. *Id*. at 322-23, 91 Cal.Rptr.2d at 498-99. The court rejected the teacher's argument on the basis that the "videotape

8

recording . . . was made in a public classroom" and was therefore not considered a "confidential communication" because the teacher's expectation that her communications and activities would be private and confined solely to the classroom was unreasonable. *Evens*, 77 Cal.App.4th at 323-24, 91 Cal.Rptr.2d at 498-99. In reaching this conclusion, the court reasoned that a teacher's communications and activities in a public classroom are not private because:

> [They] will virtually never be confined to the classroom. Students will, and usually do, discuss a teacher's communications and activities with their parents, other students, other teachers, and administrators. . . . A teacher must always expect 'public dissemination' of his or her classroom 'communications and activities.'

*Id.* at 324, 91 Cal.Rptr.2d at 499.

While not as widely accepted as the proposition that a public school teacher has no reasonable expectation of privacy in a classroom setting, a public high school coach—like a public high school teacher—is an educator, in the broadest sense of the word. The essence of an educator's role is to prepare students to fulfill their role as responsible citizens in a free society. *Lowery v. Euverard*, 497 F.3d 584, 589 (6th Cir. 2007); *Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 679 (6th Cir. 2001). "Educating students includes not only classroom teaching, but also supervising and educating students in all aspects of the educational process." *Ex parte Trottman*, 965 So.2d 780, 783 (Ala. 2007). Extracurricular activities are important to many students as part of a complete educational experience. *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 311, 120 S.Ct. 2266, 2280, 147 L.Ed.2d 295 (2000). To "educate" means "to train by formal instruction and supervised practice esp. in a skill, trade, or profession" or "to develop mentally, morally, or aesthetically esp. by instruction." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 396 (11th ed. 2009).

Although the duties of a coach are not comparable to that of the typical classroom teacher, no one could reasonably deny that some of the duties of a coach involve a type of teaching. *Theiler v. Ventura Cnty. Cmty. Coll. Dist.*, 198 Cal.App.4th 852, 859, 130 Cal.Rptr.3d 273, 277 (2011), *as modified* (Aug. 24, 2011). A public high school coach educates students-athletes in a myriad of ways. Principally, a coach provides instruction to help his players reach a certain performance standard in a chosen activity. *See Lowery*, 497 F.3d at 589 (recognizing that "the immediate goal of an athletic team is to win the game, and the coach determines how best to obtain that goal[]"); *Ex parte Nall,* 879 So.2d 541, 546 (Ala. 2003)(holding that student injured during baseball practice could not recover in negligence suit against public school coaches because they were state agents entitled to immunity for the exercise of judgment in *educating* students). Secondarily, a coach teaches his players to develop self-discipline, an admirable trait and one necessary for success in most endeavors in life, including academics. *See Lowery*, 497 F.3d at 589 (recognizing that students participating in sports develop discipline, and that "[a]thletic programs may also produce long-term benefits by distilling positive character traits in the players[]")*; Ex parte Yancey*, 8 So.3d 299, 305-06 (Ala. 2008)(holding that student injured while cleaning field house following weight-lifting class taught by high school public coach could not recover in negligence suit against the coach because he was a state agent entitled to immunity for the exercise of judgment in teaching students *discipline* in his weight-lifting class by requiring then to clean field-house facilities).

From the preceding authority, we can extrapolate that society is not willing to recognize that a public school educator—whether a teacher or a coach—has a reasonable expectation of privacy in his or her instructional communications and activities, regardless of where they occur,

10

because they are always subject to public dissemination and generally exposed to the public view.

Here, there is no doubt that Townsend was an educator helping his pupils maximize performance and develop discipline. At trial, Townsend acknowledged his role as an educator:

> [DEFENSE COUNSEL]: Even though it has a -- it can be a private dressing room during the times that you just described when the girls are changing clothes or going to the bathroom back in the bathroom part -- or it can be used as a space for you to be an educator; is that correct?
>
> [TOWNSEND]: Yes, sir.
>
> [DEFENSE COUNSEL]: I mean, it's a – it's a – it's a convenient space for you, who are supposed to be an educator, to meet with your -- the young ladies that are in a public school where you're a public teacher; is that right?
>
> [TOWNSEND]: That's correct.
>
> [DEFENSE COUNSEL]: It's a classroom basically; would you agree?
>
> [TOWNSEND]: Sometimes it is, yes.

Townsend also identified for the jury the lessons he strived to impart on his players:

> I expect my kids to work hard. I expect my kids to be disciplined. I want a disciplined team, which just means that I want the kids to play together, to do what the coaches ask them to do, to buy into what we're doing, and just play as hard as they can.
>     And, you know -- and I know winning is important. I've never been in a gym that there wasn't a scoreboard up there, so I know winning's -- the score means something, but I -- one of my -- my style has always been this, is winning takes care of itself when you -- when you develop kids who have discipline, who are determined, have determination, they dedicate theirselves, and they have a good character.
>     So we always try to do things that develop character in the kids and a good work ethic and accountability. Those are the things that we look for on a team. And something that's always been my trademark in any of my teams is we're – we're able to accomplish that, those things, whether winning or not.

Just as important, Townsend was well aware that his communications to his players were subject to public dissemination. In the audio recording of his speech to the team following the loss to

11

Sanger, Townsend can be heard telling the players:

> And you know, I know the deal. You go home and you tell your parents, 'Well, uh that's what they told me to do; I . . . screwed up but that's what they told me to do.' And that's easy to do coming from you to them, you know, when there's not me there to say, 'I don't believe that is what I told you to do.' It's kinda easy to do that, you know. If that, if that's how you live, that's that's – go ahead and live like that.

Accordingly, we conclude that society is not willing to recognize as reasonable any expectation of privacy in half-time and post-game instructional communications uttered by a public high school basketball coach to his team in the visiting locker room of a public high school.

The State takes umbrage with the proposition "that a coach addressing his team during and after a sports contest is 'equivalent' to a teacher addressing a class." The State asserts a "coach is different from a teacher" in two important respects. The first is that "[a] coach's objective is not pedagogical in nature, but rather to achieve success in the sports arena." The second is that "the nature of a coach's behavior with his team on game day" in a closed locker room is private rather than public. In essence, the State is contending that the curtailed expectation of privacy society is willing to recognize for teachers "should not automatically be applied to coaches addressing their teams at halftime or at the end of a sports contest" because a coach fulfills a different role in a different physical space. While we are not insensitive to the State's argument, we are not persuaded by it.

In support of its proposition that high school coaches are not akin to a high school teachers because high school coaches "do not contribute to a student's generalized knowledge base regarding educational requirements of a high school as do teachers of subjects such as science, math, or social studies[,]" the State cites *Dambrot v. Central Michigan Univ.*, 55 F.3d 1177 (6th Cir. 1995). The State's reliance on *Dambrot* is misplaced.

12

In *Dambrot*, the Sixth Circuit Court of Appeals held that the coach of a state university basketball team did not engage in protected speech when he used the word "nigger" during a locker-room peptalk. 55 F.3d at 1187. The court so held for a variety of reasons, including the rationale that the coach could not bring himself under the protection of academic freedom because he used the derogatory term to motivate rather than to educate. *Id.* at 1188-91. In making the point that the coach's speech was removed from any academic context, the court observed:

> Dambrot's use of the N-word is even further away from the marketplace of ideas and the concept of academic freedom because his position as coach is somewhat different from that of the average classroom teacher. Unlike the classroom teacher whose primary role is to guide students through the discussion and debate of various viewpoints in a particular discipline, Dambrot's role as a coach is to train his student athletes how to win on the court. The plays and strategies are seldom up for debate. Execution of the coach's will is paramount. Moreover, the coach controls who plays and for how long, placing a disincentive on any debate with the coach's ideas which might have taken place.

*Id.* at 1190.

But the court's observations in *Dambrot* are inapplicable in resolving this case. The issue here is whether Townsend had a reasonable expectation of privacy in his speeches. It is not, as it was in *Dambrot*, whether the contents of Townsend's speeches were protected under the First Amendment as matters of public concern. The two are distinct legal inquiries. Furthermore, the context in which sports and academics were distinguished in *Dambrot* is of no help here. The court merely illustrated the distinction between the two disciplines in relation to speech intended for a private rather than a public audience. Because the illustration does not explain why the distinction matters in any other context, it provides no guidance in answering the burning question: does a public high school coach have a reasonable expectation of privacy in half-time and post-game instructional communications to his team. *Dambrot* is thus inapposite.

13

In support of its proposition that coaches are not akin to teachers because "[,]in the context of a sports contest, a locker room is surely not a classroom, but a place for student athletes . . . to be reminded of the particular game plan and strategy for the game at hand, to consider how to improve performance at halftime of the game, and to hear an assessment of performance at the conclusion of the contest . . .[,]" the State cites *Borden v. Sch. Dist. of the Township of East Brunswick*, 523 F.3d 153 (3rd Cir. 2008), *cert denied*, 555 U.S. 1212, 129 S.Ct. 1524, 173 L.Ed.2d 656 (2009). The State's reliance on *Borden* is misplaced.

In *Borden*, the Third Circuit Court of Appeals held that a public school football coach's twenty-three-year practice of "engag[ing] in the silent act [ ] of bowing his head during his team's pre-meal grace and taking a knee with his team during a locker-room prayer" constituted an unconstitutional endorsement of religion. 523 F.3d at 158, 176-78. In reaching this holding, the court disposed of the coach's argument that his conduct was a "matter[] of public concern triggering protection of his rights, as a public employee, to freedom of speech" by highlighting the facts supporting its conclusion that the coach's speech was not public in nature:

> Borden's speech does not occur in any type of official proceeding, and even more importantly, Borden's speech does not extend into any type of public forum. In fact, Borden himself admits that the bowing of his head and taking of a knee occur in private settings, namely at an invitation-only dinner and *in a closed locker room*. Again, we find further support for this decision in the Sixth Circuit's opinion in *Dambrot*, where the court noted the private nature of the coach's message to his players because the coach's pep talk was given *in a locker room for the private consumption of his players*. 55 F.3d at 1188. Thus, we conclude that as in *Dambrot*, the bowing of Borden's head and taking a knee are meant for the *consumption of the football team only*. [Emphasis added].

523 F.3d at 171. The State directs our attention to the italicized portions of this passage.

But just as the court's observations in *Dambrot* are inapplicable in resolving this case, so too are the court's observations in *Borden*. This is because *Dambrot* and *Borden* are of the same

14

ilk.   Thus, for the reasons articulated above, *Borden* is inapposite.   Furthermore, *Roberts*, *Plock*, and *Evans* make clear that an educator has no expectation of privacy in a space where he or she is providing instructional communications and activities to students.   Here, Townsend was providing instructional communications to his players.   That the instructional communications took place in a visiting locker room is inconsequential because the space was open to and occupied by student-athletes for the very purpose of receiving instruction.

Because society is not willing to recognize as reasonable any expectation of privacy in half-time and post-game instructional communications uttered by a public high school basketball coach to his players in the visiting locker room of a public high school, Townsend did not have justifiable expectation that only they would acquire the contents of his communications. Consequently, the recordings in dispute are not "oral communications" covered by Section 16.02 of the Texas Penal Code.

Long's first and third issues are sustained.   Given our disposition of these issues, we need not address her remaining issues.   *See* TEX.R.APP.P. 47.1 (providing that the court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal).

## CONCLUSION

The trial court's judgment is reversed, and we render judgment acquitting Long of the charged offense.

June 30, 2015

YVONNE T. RODRIGUEZ, Justice

Before McClure, C.J., Rodriguez, and Hughes, JJ.

(Publish)

15